*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0331p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

RUDOLPH NICHOLAS ESCHER, JR.,
                            *Plaintiff-Appellant,*

    *v.*

BWXT Y-12, LLC,

                            *Defendant-Appellee.*

No. 09-6054

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 06-00336—Robert Leon Jordan, District Judge.

Argued: August 5, 2010

Decided and Filed: September 22, 2010[*]

Before: SUTTON and McKEAGUE, Circuit Judges; JONKER, District Judge.[**]

_____

## COUNSEL

**ARGUED:** Robert E. Pryor, Jr., PRYOR, FLYNN, PRIEST & HARBER, Knoxville, Tennessee, for Appellant. Edward G. Phillips, KRAMER RAYSON LLP, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Robert E. Pryor, Jr., PRYOR, FLYNN, PRIEST & HARBER, Knoxville, Tennessee, for Appellant. Edward G. Phillips, Charles E. Young, Jr., KRAMER RAYSON LLP, Knoxville, Tennessee, for Appellee.

---

[*] This decision was originally issued as an "unpublished amended decision" filed on September 22, 2010. On October 13, 2010, the court designated the opinion as one recommended for full-text publication.

[**] The Honorable Robert J. Jonker, United States District Judge for the Western District of Michigan, sitting by designation.

---

**OPINION**

---

McKEAGUE, Circuit Judge.   Defendant-Appellee BWXT Y-12, LLC is the managing and operating contractor for the National Nuclear Security Administration ("NNSA") at the Y-12 National Security Complex in Oak Ridge, Tennessee.  The NNSA is a semi-autonomous agency within the Department of Energy.  BWXT terminated Plaintiff-Appellant Rudolph Escher on September 22, 2005.   Escher contends that he was terminated in retaliation for complaints he made about BWXT's designation and accounting of his military leave time, which he believed violated the Uniformed Services Employment and Reemployment Rights Act ("USERRA").  BWXT claims that it fired Escher for doing work for his job in the Naval Reserves during company time and with company resources.  The district court granted summary judgment to BWXT, and we **AFFIRM**.

## I.  BACKGROUND

In 2004, BWXT changed its Military Leave Policy, and no longer allowed employees to enter a partial week of "unpaid military leave" once they had exhausted their 80 hours of military leave pay.  Escher complained about this change twice after he returned from military leave with the Naval Reserves.  First, in 2004, he complained to Linda Smith-Bledsoe, an administrative employee in payroll.  Second, in the summer of 2005, Escher complained to Smith-Bledsoe and Carol Johnson, a senior human resources specialist in compensation.

### *Work for the Naval Reserves*

Two complaints were filed against Escher regarding his Naval Reserve work. The first complaint was filed in January 2005 and led to an investigation of Escher's internet use, which was not irregular.  A second anonymous complaint was filed on August 17, 2005, and it triggered an investigation that showed irregular e-mail use, and

indicated that Escher was doing personal, Naval Reserve business while at BWXT. Thereafter, Escher was placed on administrative leave with pay.[1]

On September 15, 2005, Steven Weaver, the Labor and Employee Relations Manager, Long, and Nancy Johnson ("Johnson"), the division manager supervising Escher, met with Escher. The decision to terminate Escher was Johnson's alone to make. Escher explained that he had permission from William McKeethan, his immediate supervisor, to be copied on e-mails that he would auto-forward to his home computer. After talking to Escher, they called McKeethan, who testified that he only specifically recalled giving Escher permission to make some phone calls and to send e-mails and forward e-mails to his home computer after 911, and that he told him to keep it at a minimum. McKeethan did not recall Escher making up time for his Naval Reserve work before or after work.

Johnson reviewed the e-mails and made a rough estimate of the time Escher had put into the e-mails, file-creation, etc., and she concluded that Escher's use was not incidental and that he was doing Naval Reserve work at the expense of BWXT. She did not find any evidence to support Escher's assertion that he was making up the time. Johnson also considered other employees who had been disciplined for internet abuse, including an African American woman who was terminated after sending and receiving approximately 200 e-mails in connection with her hat-selling business. However, Johnson, a former military officer, hesitated to fire Escher for his Naval Reserve work.

Around September 20, 2005, Johnson met with Dennis Ruddy, BWXT's President and General Manager, who asked her, between the African American woman

---

[1]Samuel Long, a human resources specialist, reviewed the e-mails and documents Escher had stored on the server. Long initially discovered more than 3,200 e-mails, from 1999-2005, in more than 240 individually named folders and subfolders. He also discovered files outside the e-mail system containing: 18 PowerPoint Presentations; 75 Word documents; 38 Excel spreadsheets; 12 PDF documents; and 140 miscellaneous documents. Long determined that Escher was working on these e-mails during work hours, and using his BWXT e-mail address as an automatic signature, which invited recipients to respond to it. Long could tell from his review that Escher was spending "an inordinate amount of time by reviewing the e-mails, by replying to the e-mails, by writing paragraph after paragraph in response to different e-mails." (R. 38-53 Long Dep. 17.) The record shows that Escher sent out numerous e-mails throughout the workday. Many of these e-mails involved substantial correspondence by Escher.

Later investigation also showed that Escher used BWXT's phone system to make 110 local calls and 574 long distance calls for Naval Reserves' business. However, this phone information did not form a basis for the decision to terminate Escher.

and Escher, who had derived more personal gain from misuse of the computer. Johnson concluded that Escher had and, at that point, she decided to terminate his employment. On September 21, 2005, Johnson told Weaver and Long of her decision regarding Escher. On September 22, 2005, Johnson, Weaver, and Long met with Escher and informed him that he was terminated. Johnson, Weaver, and Long all affirmatively testified that they had no knowledge about Escher's complaints concerning how his military leave was being charged to the payroll system, that this issue was never discussed during their investigation of Escher's e-mail use, and that these complaints had nothing to do with Long's or Weaver's recommendation to terminate, or with Johnson's final decision to terminate.

Escher then brought this suit alleging violations of USERRA, the Tennessee Public Protection Act, and common law retaliation.

## II. ANALYSIS

The district court's grant of summary judgment is reviewed de novo. *Leadbetter v. Gilley*, 385 F.3d 683, 689 (6th Cir. 2004). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED R. CIV. P. 56(c)(2). When reviewing a motion for summary judgment, this court views all evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (alterations in *Moldowan*).

### 1. USERRA claim

The retaliation provision of USERRA, 38 U.S.C. § 4311(b), states that:

(b) An employer may not discriminate in employment against or take any adverse employment action against any person because such person (1) has taken an action to enforce a protection afforded any person under this chapter, (2) has testified or otherwise made a statement in or in connection with any proceeding under this chapter, (3) has assisted or otherwise participated in an investigation under this chapter, or (4) has exercised a right provided for in this chapter. The prohibition in this subsection shall apply with respect to a person regardless of whether that person has performed service in the uniformed services.

(c) An employer shall be considered to have engaged in actions prohibited --

***

(2) under subsection (b), if the person's (A) action to enforce a protection afforded any person under this chapter, (B) testimony or making of a statement in or in connection with any proceeding under this chapter, (C) assistance or other participation in an investigation under this chapter, or (D) exercise of a right provided for in this chapter, is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such person's enforcement action, testimony, statement, assistance, participation, or exercise of a right.

In order to make out a USERRA retaliation claim, an employee bears the initial burden of showing, by a preponderance of the evidence, that his protected status was a motivating factor in the adverse employment action. *Hance v. Norfolk So. Ry. Co.*, 571 F.3d 511, 517-18 (6th Cir. 2009) (per curiam); *Sheehan v. Dep't of the Navy*, 240 F.3d 1009, 1013 (Fed. Cir. 2001).[2]   Protected status is a motivating factor if a truthful employer would list it, if asked, as one of the reasons for its decision. *Coffman*, 411 F.3d 1231, 1238 (11th Cir. 2005); *see also Hance*, 571 F.3d at 518.   Discriminatory motivation can be inferred from a variety of considerations, including:

---

[2] For purposes of summary judgment, BWXT assumed that "Escher engaged in conduct protected by USERRA when he made his complaints." (R. 57 Opinion at 23.)

> [1] proximity in time between the employee's military activity and the adverse employment action, [2] inconsistencies between the proffered reason and other actions of the employer, [3] an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and [4] disparate treatment of certain employees compared to other employees with similar work records or offenses.

*Hance*, 571 F.3d at 518 (quoting *Sheehan*, 240 F.3d at 1014); *Coffman*, 411 F.3d at 1238. Furthermore, to establish actionable retaliation, the relevant decision maker, not merely some agent of the defendant, must possess knowledge of the plaintiff's protected activity. *Mulhall v. Ashcroft*, 287 F.3d 543, 551-52 (6th Cir. 2002); *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 832 (6th Cir. 1999).

If the plaintiff meets this burden, "the employer then has the opportunity to come forward with evidence to show, by a preponderance of the evidence, that the employer would have taken the adverse action anyway, for a valid reason." *Hance*, 571 F.3d at 518 (quoting *Sheehan*, 240 F.3d at 1013) (noting that the burden of production and the burden of persuasion shift to the employer).

### A. *Escher's protected activities were not a motivating factor*

#### i. *Temporal Proximity*

Escher argues that the district court overlooked that: (1) the investigation into his computer use was launched on August 17, less than 30 days after he filed his second complaint concerning BWXT's modified military leave policy; (2) Ken Brown, BWXT's legal counsel, recommended Escher's termination on September 16, 2005; and (3) several decision-makers knew of Escher's activities. However, these facts, and the remaining evidence, do not form a basis for an inference of discriminatory motive.

The investigation of Escher's e-mail use was started by an anonymous complaint. There is nothing in the record questioning the validity or anonymity of the complaint, nor is there anything questioning whether the ethics officer properly pursued the complaint. Furthermore, Johnson, Weaver, and Long all testified that they had no knowledge of Escher's complaints about military leave. Indeed, the decision to fire

Escher's was entirely Johnson's; consequently, it is a mis-characterization to imply that there were numerous decision-makers. While Johnson agrees that she "counseled with" Brown and human resources, and that they noted that Escher's behavior "hit a threshold that [BWXT] had already terminated at least one employee for," there is no evidence that she "relied on" Brown or anyone in legal or human resources for making her decision, nor is there evidence that they informed her of Escher's prior complaints about military leave. (R. 43-17 Johnson Dep. 38-39.) Since the sole decision-maker was responding to an anonymous complaint, and since she had no knowledge of Escher's military leave complaints, the temporal proximity between the investigation of Escher's email use and his complaints about military leave does not show discriminatory motivation.

### ii. Inconsistencies between the proffered reason and other actions of the employer

Escher also argues – unpersuasively – that several inconsistencies create a genuine issue of material fact as to BWXT's motivation for firing him. In particular, he points to the following facts: (1) that BWXT took no action on his first complaint; (2) the lack of credible reliance on company policy; and (3) management approval of his actions.

### a. Earlier complaint

The different treatment of the earlier complaint does not create a genuine issue of material fact. McKeethan told Weaver, whom he asked to investigate, that the first complaint alleged that Escher "spent many hours using the computer for non company business." (R. 43-7.) Weaver thought that McKeethan was referring to internet, not e-mail, misuse and accordingly asked Diane Williams, the head of BWXT Cyber Security, to "generate an Internet usage report for [] Escher." (R. 38-17 Weaver Dec. ¶ 28, Ex. 6.) The results showed no problems with Escher's internet use.

In contrast, the anonymous complaint sent on August 5, 2005, stated, in much more detailed language, that:

> I feel a supervisor in our group (badge #030198) is committing time card fraud and is blatantly abusing time. This supervisor is a full-time

employee (high level in pay) and is a member of the Naval Reserves (high level pay). The majority of his time while at Y-12 is being spent performing military work (e-mail, phone, fax, etc.). Shouldn't the military job be considered a second job since he makes a huge salary because he is very high level in the military? . . . Maybe someone needs to look at his . . . time to see what he is charging his time to because 90-95% is being spent on military work. Bet his phone records would be interesting as well.

(R. 38-16 Taylor Dec. ¶ 5, Ex. 1.)  This different language, which specifically refers to "(e-mail, phone, fax, etc.)" resulted in a different investigation, which included examining Escher's e-mail use.  Furthermore, the second complaint was sent through BWXT's "No More Surprises Program" and it resulted in a direct investigation by an ethics investigator.  Therefore, the record does not support Escher's contention that these two complaints were improperly treated differently.

### b.  Company Policy

Escher also argues that the record creates a genuine issue of material facts as to whether his Naval Reserve work constituted "official U.S. Government use" or whether it was "incidental use." Employment at BWXT is subject to the Employee Handbook: Standards of Business Conduct and Business Ethics.  The Standards of Conduct describe prohibited acts, any one of which "is grounds for disciplinary action, including termination."  (R. 38-19 Escher Dep. Ex. 2 at PRO 002327.)  Concerning the use of technology systems, the Standards of Conduct state that:

> BWXT Y-12 and client-furnished supplies and equipment are not intended for personal use.  BWXT Y-12 and client-furnished facilities, equipment, and supplies must be used only for BWXT Y-12 business or associated purposes specifically authorized by management. This applies to . . . personal computers, software, and associated support items. . . .

> Internal information systems, communications facilities and system[s] (including e-mail, interoffice mail, and voice mail networks), and databases are to be used for business purposes.  Unauthorized use is considered a misappropriation of BWXT Y-12 assets.

(*Id.* at 002332-2333.)  The "[u]se of the BWXT Y-12 e-mail system and Internet connection for personal advertisement or gain; on behalf of outside business ventures;

. . . is prohibited." (*Id.* at 002333.) However, the policy also notes that "IT resources are to be used for the conduct of official U.S. Government or Y-12 business with the exception of occasional personal non-business matters requiring attention during work hours." (R. 38-52 Ex. 4 at PRO 00112.)

The district court found Escher's argument that his Naval Reserve work constituted official government business within the meaning of the policy to be "disingenuous." (R. 57 Opinion at 27.) We agree. In light of the rest of the policy, and common sense, the phrase official government business does not permit Escher to work on separate Naval Reserve business while at work.[3]

Similarly, we agree that Escher's use of the BWXT e-mail system "was not 'incidental' by any definition of BWXT's policies; by any dictionary definition; or by any common sense understanding of the term." (R. 57 Opinion at 27.) While prohibiting the use of BWXT computers for non-business purposes, the Standards of Conduct also provide for "incidental use" that does not interfere with BWXT's operations, create additional costs, or interfere with an employee's duties. (R. 38-19 Escher Dep. Ex. 2 at PRO 002333.) From 1999-2005, Escher organized thousands of e-mails relating to his Naval Reserve work into hundreds folders and subfolders. There were also numerous documents saved outside the e-mail system. Long determined that Escher was sending and receiving e-mails during work hours, and using his BWXT e-mail address as an automatic signature, which invited recipients to respond to it. Indeed, the evidence shows that Escher received and sent out Navy-related correspondence throughout the business day and that frequently it was both extensive and amounting to multiple emails per day.

---

[3]Escher also cites other employees who had a difficult time explaining the meaning of the phrase "official U.S. Government . . . business." (Appellant Br. at 19-20; *see also* R. 43-12 Harris Aff. 2.) However, the fact that the policy did not explicitly define the term does not mean that it was ambiguous so as to permit work for the Naval Reserves, a separate employer, who paid Escher separately, simply because the Naval Reserves are a part of the U.S. Government.

### c.  Management approval

Escher also argues that there is a dispute concerning whether he had management approval to use the e-mail system for his work for the Naval Reserves.  However, as the district court correctly noted, "the proof does not show that BWXT's management knew the extent of Escher's e-mail use and condoned that use."  (R. 57 Opinion at 28.)  Even if, as Jerry Harris (a peer of Escher's at BWXT) claimed, it was common knowledge within the group that Escher had received and sent some communications for the Naval Reserves while working for BWXT, and even if McKeethan understood that Escher occasionally worked on e-mails and made phone calls for the Naval Reserves at work, this does not show approval of Escher's activities, or that management was aware of or approved of the extent of these activities.[4]  Indeed, the evidence shows that any management approval was based on an incorrect understanding of the amount of Naval Reserve work that Escher was in fact doing.

### iii.  Employer's expressed hostility

Escher acknowledges that he "is not in a position to contradict [BWXT's] treatment of military personnel" but points out that BWXT "ignored his complaints in 2004 and failed to communicate with or so much as acknowledge his ESGR

---

[4]Harris testified that it was "common knowledge within the management group, including [McKeethan], that [Escher] . . . performed occasionally work on Navy-related issues while at work for BWXT Y-12 . . . but I can affirm that [Escher] never hid the fact that he was a Naval Reservist or occasionally worked on Navy-related issues while at work for BWXT Y-12" and that "I observed [Escher] staying late on occasion and had no knowledge or impression that he was ever misappropriating company time." (R. 43-12 Harris ¶¶ 1-2, 4.)  On September 20, 2005, Long interviewed Harris, who said he was not aware "if [McKeethan] gave [Escher] permission to do Navy work on company time" and that he had not overheard any conversations between Escher and McKeethan about making up time after business hours for Naval Reserve work done during the work day.  Harris also noted that he had seen Escher staying late on occasion.  (R. 38-3 Long Dec. ¶ 22, Ex. 7 ¶¶ 22-23.)

Escher also points to testimony that McKeethan agreed that Escher could use his work e-mail to "auto forward e-mail to [his] home."  (R. 43-15 Escher Dep. 83.)  He also testified that if he "spent a minute to five minutes working on a Navy e-mail, [he] worked overtime 15 minutes to make up for that time per company policy and procedure on time charging," that "[m]y policy was, and I talked with [McKeethan] about this, if I spent more than a minute on an e-mail, that was my standard for what was incidental usage" and that McKeethan knew, "every time [Escher] had to spend any significant amount of time . . . if he wasn't at work, I would write a note on his calender.  Okay?  It didn't happen very often." (*Id.* at 93-96.)  Even assuming this testimony is true, it does not show that BWXT's management (or, for that matter, Harris) understood or approved of the full extent of Escher's cumulative work for the Naval Reserves.  Indeed, McKeethan testified that he did not give Escher "*carte blanche* permission to perform military duties at work" and that he believed Escher's e-mail use was very infrequent, as in less than once a month, and certainly not involving thousands of stored e-mails, which would have been prohibited by BWXT's computer policies.  (R. 38-16 McKeethan Dec. ¶¶ 7, 9.)

representative in 2005." (Appellant Br. at 34.) Indeed, BWXT has a long record showing that it maintains a generous military leave policy, and in 2003 and 2005 ESGR gave BWXT awards as an outstanding employer. Furthermore, the evidence does not show that BWXT ignored his complaint in 2004; instead, Smith-Bledsoe discussed the matter with Escher and referred him to Cottrell or Brown, and Brown ultimately responded to Escher's concerns in 2005 in a way that was satisfactory to him.

### iv.  Disparate treatment of certain employees

Finally, there is no evidence of disparate treatment between Escher and similarly situated employees. It is Escher's burden to show that the other employees' acts were of "comparable seriousness" to his own infraction. *See Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002). The only other employee found to have used BWXT's computer system for personal gain was an African American female who was terminated after sending or receiving 200 e-mails regarding her hat-selling business. Escher, whose conduct was clearly more egregious, was also terminated. *See also Wright v. Murray Guard, Inc.*, 455 F.3d 702, 711 (6th Cir. 2006) (noting that, when considering whether two employees are "similarly situated," it is proper for an employer to consider its legal obligations, especially to a class of people protected by federal and state law). Escher also refers to other employees who were disciplined short of termination for internet use violations. However, these employees were disciplined after Johnson decided to terminate Escher, and none of them engaged in personal business or had the same degree of non-BWXT e-mail use that Escher did. This evidence does not show disparate treatment.[5]

---

[5]Of the four employees investigated after Escher was terminated, who were not terminated, one employee had accessed The New York Times web site largely during his lunch break and accumulated approximately 80 hours of non-work-related internet use. The second employee had 68 inappropriate e-mails, mostly jokes and mostly received. The third had 54 inappropriate e-mails, again mostly jokes, some with sexual references. The fourth sent one sexually explicit e-mail and 26 others, some with objectionable language, to co-workers.

Ten other employees had also been terminated for violating internet policy at the time of Escher's termination. The only employee investigated before Escher for violating the policy who was not terminated had conducted four hours of non-business internet activity. Most of the terminated employees were fired for time spent at adult sites. However, an African American woman and another employee who had 93 hours of E-bay activity over 27 days had also been terminated.

### B.  *BWXT would have taken the same action*

Even assuming Escher could make out a prima facie case, we note that BWXT can show that it would have terminated him anyway, for a valid reason.  Escher argues that there is a genuine issue of material fact as to whether BWXT would have taken the same action because of: (1) the different results stemming from the two complaints of computer abuse; (2) the limits on Johnson's understanding of Escher's e-mail abuse; and (3) the fact that other decision makers were included in the process.

The district court noted helpfully that Escher's argument "is basically saying that BWXT's reasons for firing him were a pretext for discriminating against him based upon his leave complaints."  (R. 57 Opinion 34.)  In discrimination cases, this court has adopted a "modified honest belief" rule which states that "for an employer to avoid a finding that its claimed nondiscriminatory reason was pretextual, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made."  *Wright*, 455 F.3d at 708 (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998)).  The investigation process does not need to be perfect, but the employer must make "a reasonably informed and considered decision before taking an adverse employment action."  *Smith*, 155 F.3d at 807; *Graham v. Best Buy Stores*, 298 F. App'x 487, 494 (6th Cir. Oct. 22, 2008) (noting that the employer needs to show that it "made its decision to terminate [the employee] based on an honestly held belief in a nondiscriminatory reason supported by particularized facts after a reasonably thorough investigation").

Turning to Escher's arguments, as discussed above, there is good reason for the different results stemming from the two complaints.  Moreover, while Johnson may have consulted with others before making her decision, the record makes it unambiguously clear that she made the ultimate decision and that she had no knowledge of Escher's complaints about military leave.  The record also shows that Johnson made a reasonably thorough investigation and that her decision was based on an honestly held belief in a nondiscriminatory reason and supported by particularized facts. In particular, she personally reviewed the e-mails that Escher worked on and concluded that Escher:

(1) was not auto-forwarding e-mails to his home but was sending, responding, and interacting with thousands of messages; (2) was not doing this at lunch or outside of business hours but during the workday; and (3) put his BWXT e-mail address and phone numbers at the bottom of his e-mails. She talked to Escher and McKeethan, and consulted with Ruddy, Weaver, Long, Brown, Taylor, and others before deciding to fire Escher. Johnson found McKeethan, who did not corroborate Escher's account, to be truthful and forthright. She also carefully considered the treatment of other employees. Finally, her reading and interpretation of company policy to call for Escher's termination was honest and reasonable. Consequently, there is no genuine issue of material fact that BWXT made its decision to terminate Escher based on an honestly held belief in a nondiscriminatory reason supported by particularized facts after a reasonably thorough investigation.

### 2. *Escher's state law claims*

Escher asserts genuine issues of material fact exist in support of his claims of retaliatory termination (for complaining about military pay) in violation of Tennessee's "whistleblower statute," the TPPA, and Tennessee's common law retaliation law. Escher's TPPA claim requires that he point to evidence showing: (1) his status as an employee of BWXT; (2) his termination; (3) his refusal to participate in, or remain silent about, illegal activities; and (4) an exclusive causal relationship between his refusal to participate in or remain silent about illegal activities and his termination by BWXT. TENN. CODE. ANN. § 50-1-304; *Anderson v. Standard Register Co.*, 857 S.W.2d 555, 558 (Tenn. 1993); *see also Guy v Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 535-37 (Tenn. 2002) (noting that "[t]o make out his TPPA claim, Escher must prove that his complaint was the 'sole' or 'exclusive' cause of his termination"). As discussed above, the evidence shows that Escher was fired for his violation of BWXT's computer policy. Consequently, his TPPA claim fails.

Escher's common law retaliatory discharge claim requires that he point to evidence showing that: (1) an employment-at-will relationship existed; (2) he was discharged; (3) the reason for his discharge was that he attempted to exercise a statutory

or constitutional right, or for any other reason that violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) a substantial factor motivating the employer's decision to discharge him was his exercise of protected rights or compliance with clear public policy. *Guy*, 79 S.W.3d at 535 (emphasis added); *Chism v. Mid-South Milling Co.*, 762 S.W.2d 552, 555-56 (Tenn. 1988). This standard mirrors the standard for Escher's USERRA retaliation claim. Initially, Escher must make out a prima facie case and then, if he succeeds, the burden shifts to BWXT to come forward with a legitimate, non-retaliatory reason for the discharge. *Anderson*, 857 S.W.2d at 558-59; *Provonsha v. Students Taking a Right Stand, Inc.*, 2007 WL 4232918, at *2-*4 (Tenn. Ct. App. Dec. 3, 2007); *Robinson v. Nissan Motor Mfg. Corp., No.*, 2000 WL 320677, at *5-*6 (Tenn. Ct. App. Mar. 29, 2000). Once BWXT establishes its legitimate non-discriminatory reason, the burden shifts back to Escher to prove that the explanation is pretextual. *Robinson*, 2000 WL 320677, at *5-*6; *Provonsha*, 2007 WL 4232918, at *2-*4. For the same reasons Escher cannot make out a USERRA retaliation claim, we find that Escher cannot make out a common law retaliation claim.

### III. CONCLUSION

Escher does not point to evidence showing that his protected status was a motivating factor in the adverse employment action. Furthermore, even if he could, BWXT can show that it would have taken the adverse action anyway, for a valid reason. Consequently, we **AFFIRM**.