NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0460n.06

No. 14-3704

**FILED**
Jun 19, 2015
DEBORAH S. HUNT, Clerk

## UNITED STATES COURTS OF APPEALS
## FOR THE SIXTH CIRCUIT

KENNETH ROTH,                                      )
                                                   )
    Plaintiff-Appellant,                           )
                                                   )
                                                   )    ON APPEAL FROM THE
v.                                                 )    UNITED STATES DISTRICT
                                                   )    COURT FOR THE
WEST SALEM POLICE DEPARTMENT, et al.,              )    NORTHERN DISTRICT OF
                                                   )    OHIO
    Defendants-Appellees.                          )
                                                   )
                                                   )


BEFORE:    MERRITT, BOGGS, and ROGERS, Circuit Judges.

        ROGERS, Circuit Judge.  Kenneth Roth was a part-time police officer in the West Salem

Police Department, and also a member of the Marine Reserves who was deployed to Iraq on two

occasions.  Roth was passed up for a promotion to sergeant in the police department while he

was away on his second deployment.  Shortly after he returned to the police force from that

deployment, he was suspended pending completion of anger management classes and passage of

a psychological evaluation.  Roth did not pass the evaluation and eventually the Village of West

Salem terminated him.  Roth sued the Village, arguing that the police department's failure to

promote him and his suspension and subsequent termination violated the Uniformed Services

Employment and Reemployment Rights Act protecting military personnel and veterans from

discrimination.  Roth also alleged that his suspension violated Ohio disability discrimination law.

The district court granted summary judgment to the Village, and Roth appeals, arguing that he

had presented enough evidence to warrant a trial on both claims. However, the record demonstrates that the police department's actions with respect to Roth were justified by valid, non-discriminatory reasons.

Roth was commissioned as a paid West Salem police officer in February 2001. His first six months were a probationary period, which was extended for another six months for unclear reasons in September 2001. On October 12, 2001, Roth received a written warning from then-Police Chief Terry Johns for failing to obey an order. The warning was "final," and stated that the "[n]ext procedure will result in dismissal," but it is not clear whether this applied only to Roth's probationary period. Aside from brief training periods, Roth always worked for the police department on a part-time basis, and he worked full-time for a security contractor at a NASA facility. When he became a police officer, Roth was a member of the Marine Reserves, having previously served on active duty.

Roth's time on the West Salem force was punctuated by three leaves of absence. First, from February 2005 to September 2005, Roth was deployed to Iraq. Second, in 2007, Roth took time off to receive counseling from the Veterans Administration while going through a divorce. Third, Roth was deployed to Iraq again in May 2008, returning to the United States in April 2009 and being released from active duty in June 2009.

Prior to the start of Roth's first deployment to Iraq in February 2005, Chief Donald Sims (who had succeeded Chief Johns) received a complaint that Roth had stopped a motorist who had circled the block while waiting to pick up a passenger. Chief Sims addressed the issue informally by having a conversation with Roth about the standard for probable cause.

Upon his return in September 2005, Chief Sims had Roth ride patrol with Captain Ray Leiby "for a couple of weeks so that he could be reacclimated to West Salem and his duties,"

after which Roth went back on patrol. Roth's time in Iraq during his first deployment apparently affected his approach to police work. Many of Roth's colleagues in the Marines were killed during his deployment, some in ways Roth felt had been preventable. As a result, Roth became extremely sensitive to decisions by superiors that Roth saw as putting the lives of Roth's colleagues at risk. At the West Salem Police Department, Roth perceived Chief Sims and one other colleague as incompetent. Tina Barnette, the Department's administrative assistant, testified that Roth's colleagues were aware that Roth was dissatisfied. In spite of these tensions, Chief Sims only recalled having one issue with Roth in the period between his two deployments: Chief Sims wrote Roth a letter asking him not to work hours beyond his scheduled shift without Captain Leiby's or his permission. (Working extra hours was a problem because of budget constraints.)

When Roth was again deployed to Iraq in May 2008, both he and Chief Sims expected him to return to the West Salem Police after his deployment. Chief Sims requested and obtained an extension for Roth to complete state-mandated continuing training requirements that he could not complete while deployed. Roth, meanwhile, kept in touch with Barnette via email from Iraq and expressed, in her paraphrase, that he had "a big vision" for changes to the police department.

Roth's relationship with the leadership of the police department deteriorated quickly after he returned from his second deployment in the summer of 2009. While still in Iraq, Roth learned that a fellow patrolman, Dozier Hendershot, had been promoted to sergeant ahead of him. Prior to returning to the force, Roth emailed a friend and fellow patrolman, George Paine, expressing that he was "upset" about this development. Nonetheless, he took a training course paid for by West Salem in August 2009 in preparation for returning to the police force. Upon resuming work in September, Roth expressed to Captain Leiby his "[d]isappointment in not being

promoted, as well as [his belief] that the department had violated USERRA [the Uniformed Services Employment and Reemployment Rights Act] in promoting someone without a test or any form of board." Captain Leiby essentially brushed aside Roth's complaint. As Roth recalls the conversation, Captain Leiby said something to the effect of "Combat veterans probably shouldn't be promoted anyway because they don't understand, because it's a different world between the military and law enforcement."

The decision to promote Hendershot over Roth had been made by Chief Sims, in consultation with Captain Leiby. Chief Sims and Captain Leiby considered Hendershot, Roth, and a few other patrolmen. Chief Sims saw Hendershot as the best choice for a number of reasons. Comparing Roth and Hendershot, Chief Sims claimed that Hendershot was easier to work with, had incurred no citizen complaints, and could be relied on to follow orders, whereas this was not always the case with Roth. Chief Sims also noted that Hendershot was the only patrolman who did not have any other job and was willing to take on a large amount of hours, which Chief Sims interpreted as a sign of loyalty.

Roth's return to his patrolman position in the shadow of this controversy was short-lived. After Roth had worked only three non-consecutive shifts over the course of a few days, Chief Sims, after consulting with Captain Leiby, instructed Roth not to return to active patrol pending Roth's completing an anger management class and passing a psychological examination. Chief Sims hand-delivered a letter to Roth explaining his decision and listing concerns about Roth's performance. The letter emphasized the following specific issues:

1. Roth displayed an "aggressive demeanor" to Barnette, the administrative assistant, and as a result "she does not feel safe at work when [Roth is] around."

2. Roth was "rude" to his colleagues and "insubordinate" to the administration, leading some of the colleagues to "avoid talking to [him], so they do not get

involved in any situation [he] may find [himself] in while working [at the police department]."

3.  Roth took a department radio home without permission, contrary to a standing policy that officers working relatively few hours should leave radios for others at the end of their shifts.

4.  On his second shift of duty after resuming work, Roth worked extra hours without permission or any clear justification, just as he had done when he received a caution letter in 2007.

5.  Also during his second shift of duty, Roth stopped a motorist "for no reason, other than [Roth] thought he looked suspicious." This resulted in a complaint to the police department from that motorist.

6.   Captain Leiby attempted to discuss some of these issues with Roth, but Roth "argued with him" and became "aggressive and angry."

In order to "protect the workers and citizens of West Salem from an angry police officer," Chief Sims decided to suspend Roth from patrol duties without firing him. The letter laid out a procedure for being reinstated to patrol duty:

> [Y]ou will not be scheduled to work the street as a patrolman until such time as you are able to complete an anger management class and obtain a psychological exam by a doctor qualified to perform such examinations on police officers to determine your suitability to work in the field of law enforcement. Upon successful completion, you will meet with me and the Mayor. You may be asked to ride a few shifts to be reintroduced to representing the Village of West Salem as a patrolman.

This procedure, which Roth ultimately did not complete, was beset by delays. Chief Sims assumed Roth would get anger management counseling for free or at a subsidized rate at the VA. Roth eventually did, earning a certificate of completion of "cognitive processing therapy" on May 25, 2010. Although Roth provided the certificate of completion to Captain Sims, Chief Sims did not contact Roth about scheduling the psychological examination until October 6, 2010. Dr. John Jorden conducted the examination and sent a summary of the results to Chief Sims (with a copy to Roth) on December 10, 2010. The report indicated that Roth had "had temper and control issues," and "showed signs of unresolved grief and PTSD." The report

also stated that Roth "no longer wants to work with the current situation at West Salem" and "plans to go on to [l]aw [s]chool." Dr. Jorden did not approve Roth's return to active duty, but also stated that "[p]eople and situations change," suggesting that Roth might be able to return at some point in the future.

On February 8, 2011, Chief Sims sent Roth a letter asking whether Roth still intended to return to the West Salem police. Roth received the letter but never responded. On March 9, Chief Sims sent Roth a second letter warning Roth that if he did not respond by March 22, his failure to do so would be treated as a resignation and his position with the police department would be terminated. Roth also received this letter but did not respond. Roth was terminated on March 22; the termination form listed him as having "resigned."

Roth filed suit against the West Salem Police Department on February 14, 2013. He filed an amended complaint substituting as defendant the Village of West Salem (which was his formal employer). The complaint alleged that the police department discriminated against Roth on the basis of disability in violation of the Ohio Civil Rights Act (OCRA) and that the department's failure to promote Roth and his termination both violated USERRA. Following discovery, the Village of West Salem moved for summary judgment. The district court granted the Village's motion on July 1, 2014. The district court found no evidence in the record supporting a conclusion that the police department's promotion of Hendershot over Roth was connected to Roth's military service, instead noting the performance- and loyalty-related reasons provided by Chief Sims. The district court next held that Roth had not been terminated in violation of the USERRA because his failure to respond to Chief Sims's letters following his psychological evaluation amounted to a resignation, so there was no adverse action by the department. Finally, the district court found no triable issue of fact as to the OCRA

discrimination claim because requiring a psychological examination to determine whether Roth could perform his duties was not an "adverse action." Accordingly, the district court granted summary judgment to the Village. Roth appeals.

Roth did not raise a triable issue of fact as to whether Chief Sims's decision to promote Hendershot to sergeant ahead of Roth was motivated by Roth's military service. Even if the employee bringing a USERRA claim can demonstrate that the employer's adverse action was motivated by animus against the employee's protected status, the employer may still prevail by proving that it would have taken the adverse action even absent that illicit motivation. *Hance v. Norfolk S. Ry. Co.*, 571 F.3d 511, 518 (6th Cir. 2009). Although Roth did present circumstantial evidence that Captain Leiby may have harbored unlawful animus against Roth and may have influenced Chief Sims, Roth cannot rebut the Village's evidence showing that he would not have been promoted even absent his military service.

First, Roth's failure-to-promote claim depends entirely on the decision to promote Hendershot. Although Paine was also promoted to sergeant, Paine was promoted after Roth had been terminated. The termination was reason enough not to promote Roth, provided that the termination was not itself unlawful, a question addressed below. Roth's arguments relating to Paine's promotion and the reasons for it are therefore not relevant.

Roth has arguably presented evidence that might convince a reasonable jury that his military service was a motivating factor in the decision to promote Hendershot over him.[1] Roth's allegation that Captain Leiby said something along the lines of "Combat veterans

---

[1] The Village's argument that Roth is not entitled to a promotion (an argument that refers to the reemployment protections of 38 U.S.C. § 4312) is inapposite. Roth does not claim that he was entitled to an automatic promotion upon reemployment, but rather that the police department discriminated against him on account of his military status in deciding whom to promote, a claim that invokes the anti-discrimination provisions of 38 U.S.C. § 4311.

probably shouldn't be promoted . . . because they don't understand, because it's a different world between the military and law enforcement" could reasonably be interpreted as reflecting animus. This animus, if it existed, could have played a role in the promotion decision, as Chief Sims consulted with Captain Leiby when deciding who to promote.

However, there is no liability under the antidiscrimination provision of USERRA if "the employer can prove that the action would have been taken in the absence of" the plaintiff's protected military status or activity—in which case any animus was neither the but-for nor the proximate cause of the adverse action. 38 U.S.C. § 4311(c)(1); *see Escher v. BWXT Y-12, LLC*, 627 F.3d 1020, 1030 (6th Cir. 2010). The Village has made such a showing, and Roth has not rebutted it. Chief Sims identified the factors that he considered in promoting Hendershot: availability to work long hours, ability to follow orders and work smoothly with superiors, and absence of citizen complaints. Roth has not cast doubt on the conclusion that, applying these factors, Hendershot's promotion was justified. At the time that the promotion decision was made during Roth's second deployment, Roth had already been the subject of a citizen complaint, he had already experienced conflicts with coworkers and been reprimanded for not following orders, and (when not deployed) he had another job that limited his availability. Roth's only argument is that the lack of a formalized selection process suggests that Chief Sims's reasons might be pretextual. But it is reasonable for a small police department such as that of West Salem to make personnel decisions informally, and the factors Chief Sims used also appear reasonable. Roth has therefore failed to present a triable issue as to whether the police department's failure to promote him violated USERRA.

Roth has also failed to raise a triable issue as to the motivations for his suspension and ultimate termination. Although his suspension was an adverse action for purposes of USERRA

and he might possibly show that it was motivated by animus against his military service or veteran status, he cannot rebut the Village's non-discriminatory reasons for suspending him. A cat's paw theory of liability tying Captain Leiby's bias to Chief Sims's actions is still theoretically available, and, though the evidence is more tenuous, Captain Leiby's allegedly biased statement is still applicable to Roth's suspension. However, again, the Village presented significant unrebutted evidence that Roth would have been suspended even absent his military service and veteran status. If this conclusion is correct, then the delays in the post-suspension process and Roth's ultimate abandonment of his position do not raise concerns under USERRA.

While the district court was correct that Roth's termination, in and of itself, was a resignation that cannot be an adverse action, the focus should instead be on Roth's suspension prior to his termination. If the suspension was indeed based on antimilitary bias, and if Chief Sims intentionally impeded Roth from meeting the conditions for reinstatement, then Roth was de facto terminated in violation of USERRA. Moreover, the suspension itself was an adverse action for purposes of USERRA, which broadly protects "initial employment, reemployment, retention in employment, promotion, or any benefit of employment." 38 U.S.C. § 4311(a). Thus, the Village's liability turns on the motivation for Roth's suspension.

We assume for purposes of argument that Roth has presented a plausible case that there was illicit animus affecting Roth's suspension. Again, it is possible that Captain Leiby's statement about promoting combat veterans reflects an anti-veteran bias, although to be applicable here it would have to be a general bias against combat veterans in the police force, rather than a bias against promoting them. However, again, there is strong evidence that Chief Sims and Captain Leiby relied on valid reasons unrelated to Roth's military status in suspending

Roth, and that they would have done so even absent Roth's military status. Roth is unable to rebut enough of this evidence to raise an issue of triable fact.

True, Roth may have created a genuine issue of fact with respect to the validity of two of the reasons: Captain Leiby's report regarding Roth's aggressive demeanor and uncooperative attitude, and his taking a police radio home with him. Because it is possible that Captain Leiby was biased against Roth, it is possible that Captain Leiby's report of Roth's bad attitude was tainted by this bias. There is no direct connection between the police radio incident and any potential bias, but it is plausible, as Roth has suggested, that Roth was unaware of the (relatively recent) rule about taking home police radios and ought not to have been blamed for taking one home.

But Chief Sims's other reasons for suspending Roth are supported by the evidence and amply justified suspension. Roth does not dispute that he worked hours beyond his shift without permission, after already having been warned not to do so in 2007. Barnette's testimony more or less corroborates Chief Sims's report that she felt unsafe because of Roth's aggressive demeanor. Although Barnette denies that she actually felt personally threatened by Roth, she believes Chief Sims reached this conclusion based on her report of "comments he made about the killing of people and talking about this weapon that he had and things of that nature." "This weapon" was a "five thousand dollar assault weapon" that Roth had purchased, not his service weapon, and "killing somebody" referred to Roth "not having a problem killing somebody if he were to have to do that." Barnette testified that hearing this made her "greatly concerned, not only for myself, but also for him." This testimony corroborates the gist of Chief Sims's allegation that Barnette said that Roth displayed an aggressive demeanor and frightened her.

Barnette's testimony also corroborates Chief Sims's allegation that other officers found Roth insubordinate and rude. Barnette testified that other officers said Roth was "insubordinate" and "didn't have respect for the chief," and that "some of the part-time officers" complained about his "attitude and demeanor," saying he was "hard to get along with" and "not a team player." This allegation is also corroborated to some extent by Roth himself, who admitted that he is unwilling to obey orders that will put his colleagues in danger and will not remain silent if he sees things being mismanaged, and Roth's expert Dr. Richetta, who noted that Roth "would be likely to have administrative conflicts with superiors in a work place."

Finally, there is some evidence suggesting that the citizen complaint about Roth making a traffic stop without probable cause is accurate. Both Barnette and Chief Sims recall speaking with a motorist who reported that Roth executed a military-style stop (pulling in front of the stopped car to block it rather than pulling up behind). After receiving the citizen's complaint, Chief Sims asked Roth for his version of the event, and recalls having the following exchange: "I asked what about the vehicle was suspicious. His reply, it was driving around at West Salem at that hour." Because Chief Sims's report of Roth's statement is not hearsay under Fed. R. Evid. 801(d)(2)(A), there is admissible evidence that the stop occurred and that Roth did not have probable cause to make the stop. (Roth himself does not recall whether the stop occurred or not.) Barnette's and Chief Sims's statements about the citizen's complaint (which are the only source of information about how Roth conducted the stop) are hearsay, but they can still be used to show the effect of the complaint on the listeners, Barnette and Chief Sims. *See Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 379 (6th Cir. 2009). Showing the effect on Chief Sims is helpful to the Village because factually false justifications are not pretextual if the decisionmaker has an "honest belief" in them after conducting a reasonable investigation. *Escher*, 627 F.3d at

1030. The citizen's complaint would support a belief that the stop occurred as described, even if it were false, although Chief Sims performed virtually no investigation other than asking for Roth's version of events. Roth's account may have confirmed enough particulars that Chief Sims felt that suspension was warranted. Further, given the other concerns Chief Sims had about Roth's behavior, it may have been reasonable to limit the time spent on investigation before acting. At any rate, the admissible and unrebutted evidence that Roth had conducted what appears to be a completely baseless traffic stop is itself cause for concern, especially in conjunction with Roth's general behavior as observed by Barnette and Chief Sims.

In total, Roth is unable to provide evidence rebutting the majority of the issues identified in Chief Sims's letter, including what appear to be the most serious ones. As a result, there is no triable issue of fact as to whether Roth would have been suspended even absent his military status. Because Roth's suspension did not violate USERRA, it follows that his failure to complete the terms of his suspension, which led to his termination, cannot give rise to liability under that statute.

Finally, Roth alleges that his suspension violated O.R.C. § 4112.02(A), which provides that it is "an unlawful discriminatory practice" for "any employer, because of the . . . disability . . . of any person, to discharge without just cause . . . or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." On appeal, Roth acknowledges that psychological evaluations in themselves are not adverse actions, but argues that the suspension pending a psychological evaluation was a pretense—a way to prevent Roth from working—motivated by animus against Roth's disability. However, it was proper to dismiss this claim because Roth

cannot prove that he would have been able to perform his patrol duties in spite of his disability—mental illness.

To prevail on this claim, Roth must prove that he was able to perform his patrol duties at the time that he was suspended, which he cannot do. To establish discrimination on the basis of disability, a plaintiff must prove not only that he is disabled and that his employer took an adverse action because of his disability, but that he "can safely and substantially perform the essential functions of the job in question with reasonable accommodations." *Blankenship v. Martin Marietta Energy Sys., Inc.*, 83 F.3d 153, 155 (6th Cir. 1996). Roth does not argue that he needed any accommodation, and his inability to rebut the allegations in Chief Sims's letter, as described above, suggests that Roth was not able to safely perform the duties of a police officer. This conclusion is supported by both of the psychiatric evaluations that are in the record. First, Dr. Jorden concluded in December 2010—more than one year after Roth's suspension, and after Roth had completed an anger management class—that "Ken is guided by his logical self, but is having to manage a host of emotional issues which prohibit his being an officer at this time." Approximately twenty months later, when Dr. Richetta concluded that Roth could again work as a police officer, she noted the progress Roth had made:

> Although he has been diagnosed with a Posttraumatic Stress Disorder secondary to his military service, the immediate evaluation finds little residual from that condition impacting his life now. He has undergone considerable psychotherapy including specialized treatment through the VA for service persons with PTSD. The PTSD is manageable and is not likely to affect his working as a police officer.

This suggests that PTSD did not prevent Roth from functioning as a police officer in the fall of 2012 in part because of the treatment he had received. He received virtually all of this treatment after he was suspended, since he recalls having been diagnosed with PTSD "somewhere between June and September, or maybe October" of 2009, around the same time he was suspended.

These analyses strongly suggest that in September 2009, with barely-diagnosed PTSD and just a few months removed from his last deployment to Iraq, Roth was not able to effectively and safely perform the duties of a police officer.

For the foregoing reasons, the district court's grant of summary judgment to the Village is affirmed.