NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0088n.06

Case No. 24-3761

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|

FILED
Feb 13, 2025
KELLY L. STEPHENS, Clerk

MERIBETHE R. INGRAM,

     Plaintiff-Appellant,

v.

JARED J. REGANO, Administrator of the
Estate of Joseph V. Regno, deceased; FRED
E. BOLDEN, II,

     Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF
OHIO

OPINION

Before: SUTTON, Chief Judge; SUHRHEINRICH and SILER, Circuit Judges.

SUTTON, Chief Judge. After a school district found that Meribethe Ingram harassed the teacher for whom she volunteered, officials prohibited her from continuing to work at that school. Two additional internal investigations left that decision intact. Ingram sued, challenging the district's investigatory process. Both parties moved for summary judgment. The district court granted the school officials' motion and denied Ingram's motion. We affirm.

I.

Beginning in August 2016, Ingram volunteered at Lewis Elementary to be a reading aide in Randy Davis's second-grade classroom. Her children went to the same school. After Ingram sent Davis inappropriate emails during the school year as well as during the start of the next school year, Davis complained to the principal. In October 2017, the principal told Ingram to cease

contact with Davis and warned that her failure to comply would prevent her from volunteering at the school. When she emailed Davis again in December to tell him she had "reason to believe that perhaps [he] would like to discuss" their situation, R.111-24 at 1, Davis forwarded the message to the principal, and the school district prohibited Ingram from working at Lewis Elementary anymore.

Ingram persisted. That same December, she wrote Davis again, saying that "[o]f course," she was "attracted to" him, that her husband thought Davis was "a threat to his marriage," and that she could not "understand why [he] shared [their] emails with" school officials. R.111-26 at 2–6. At that point, Ingram complained to the school, claiming that Davis had harassed her.

In January 2018, the school district investigated both claims—that Ingram had harassed Davis and that Davis had harassed her. The superintendent, Joe Regano, and assistant superintendent, Fred Bolden, led the effort. Regano issued a 28-page report on behalf of the school district in March 2018. The report deemed Ingram the harasser and upheld her restriction from volunteering or otherwise working at the school.

Meanwhile, as the first investigation proceeded, Ingram filed a new complaint with the school district. This time, she trained her sights on Bolden and Regano instead of Davis, alleging that they restricted her from working at the school in retaliation for reporting Davis. The school district hired an independent investigator, attorney Katie Clifford, to handle the investigation. After interviewing 28 witnesses, Clifford concluded—in a 42-page report—that no retaliation had occurred. She found that Ingram's ban on working at Lewis Elementary stemmed from her failure to comply with the principal's directive that she stop communicating with Davis. The school district adopted those findings in the spring of 2018.

2

That did not end matters. Between December 2018 and January 2019, Ingram filed five more complaints alleging that the investigations violated the school district's sexual-harassment policies. In response, the school district hired another independent investigator, this time the Taft Stettinius & Hollister law firm. After re-interviewing witnesses and re-examining the relevant evidence, Taft concluded that only one "technical misstep" from school policy occurred when officials failed to memorialize Davis's verbal complaint of harassment. R.111-37 at 180. Otherwise, it found no policy violations in the harassment investigation, and found Clifford's findings credible.

Ingram turned to the courts. In 2019, she sued Regano and Bolden in federal court. Discovery ensued over three claims: (1) retaliation under Title VII and Ohio law; (2) sex discrimination under the Equal Protection Clause of the U.S. Constitution, Title VII, and Ohio law; and (3) tortious civil conspiracy under Ohio law. Ingram moved for partial summary judgment, while Regano and Bolden moved for summary judgment on all of the claims. The district court granted Regano and Bolden's motion and denied Ingram's motion, entering a final judgment. This appeal—now the third time this court has considered Ingram's case—followed. *Ingram v. Regano,* No. 21-3342, 2022 WL 320216 (6th Cir. Feb. 3, 2022); *Ingram v. Regano*, No. 23-3222, 2023 WL 6634262 (6th Cir. Oct. 12, 2023) (per curiam).

II.

We review the district court's summary judgment ruling afresh, asking whether Ingram's claims present a "genuine dispute as to any material fact," or whether Regano and Bolden are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In answering these questions, we draw all reasonable inferences of fact in Ingram's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

3

A.

*Retaliation under Title VII and Ohio law*. Ingram claims that Regano and Bolden retaliated against her for filing a complaint against them in February 2018. Title VII prohibits employers from retaliating against employees who file complaints against them. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). Ohio's Fair Employment Practices Act does likewise. Ohio Rev. Code Ann. § 4112.02(I). We analyze both claims under the same framework, *Abbott v. Crown Motor Co.*, 348 F.3d 537, 541 (6th Cir. 2003), which proceeds in three steps. We start by asking whether Ingram has made out a prime facie case of retaliation: that (1) she engaged in a protected activity, (2) Regano and Bolden knew about the protected activity, (3) the pair then took an adverse action against her, and (4) the protected activity caused the adverse action. *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018). If Ingram makes that showing, we ask whether Regano and Bolden have articulated a legitimate, non-retaliatory reason for their actions. *Id.* at 777. If they do, we ask whether Ingram has met her burden of showing that the explanation is pretextual. *Id.*

Ingram points to two alleged acts of retaliation: (1) Regano's March 2018 report siding with Davis in the initial sexual harassment investigation and (2) Regano and Bolden's involvement in the Clifford investigation despite their status as named parties to the relevant complaint. Both parties use many bytes of briefing to debate whether Ingram has made out a prima facie case. We need not resolve those arguments. Even if we assume that Ingram has made that initial showing, Regano and Bolden have articulated legitimate, non-retaliatory reasons for both actions—and Ingram has not created a material fact dispute over pretext.

Ingram's first theory, recall, goes like this. After she filed her February complaint against Regano and Bolden, Regano allegedly retaliated by deeming her the harasser in his March report.

4

But Regano provided a legitimate, non-retaliatory reason for his action in his March report— namely, that all of the evidence before him supported the conclusion that she harassed Davis, not the other way around. The email traffic—most of which Regano's report summarized, and none of which Ingram disputes—makes that clear. At first Davis enthusiastically expressed his appreciation for Ingram's help. But that enthusiasm waned, then turned to reticence, when Ingram started to send more personal emails: emails describing prior romantic relationships in other teaching jobs, revealing her "weakness for friendships with male educators," and acknowledging that her "motives" could be "easily misconstrued." R.111-12 at 2–4. When Davis rejected Ingram's offer to volunteer for his class in the next school year, she called him "difficult," R.111-4 at 1, "arrogant," and "ungrateful." R.111-16 at 1. She hypothesized that Davis was "attracted to [her]" and that this emotion "turned to guilt and dislike." R.111-16 at 1. After Davis reported Ingram to the school principal, and after the principal directed Ingram to stop emailing Davis, she persisted. As Regano recognized, and as independent investigators confirmed, this record provided an ample non-retaliatory reason to suspend Ingram.

In trying to fend off this conclusion, Ingram uses several emails to try to establish pretext. She points to an email that she sent to Davis, in which she said that she was not attracted to him but suspected that he felt differently. She guesses that, from this email, he suspected she might complain about his behavior so decided to complain about hers as a "preemptive strike." Appellant's Br. 37. She points to an email from Davis in which he expressed fear that school officials would rule against him, calling "the whole thing . . . hurtful fiction." R.118-5 at 1. From this, she claims that school officials were going to rule against him, at least before Regano caught wind of her complaint against him. She also points to the deposition of one board member, who vaguely recalled a letter Ingram supposedly sent to Davis "about her past conquests." Appellant's

5

Br. 41. Because the board member couldn't identify the exact letter during her deposition, she claims that someone must have shredded the document.

All of this comes up short. To show that Regano's rationale was pretextual, Ingram had to provide more than conclusory assertions. *Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005). Her responses do just that and are unreasonable to boot. Summary judgment "does not allow, much less require, that we draw strained and unreasonable inferences in favor of the nonmovant." *Audi AG v. D'Amato*, 469 F.3d 534, 545 (6th Cir. 2006) (quotation and emphasis omitted). Ingram cannot show a triable issue of fact that way.

Ingram pivots to temporal proximity. She claims that, because the district's first investigatory report came two weeks after she filed her retaliation complaint, Regano's stated motivations for the report must be pretextual. In some settings, it is true, suspect timing along with other suspicious circumstances may support an inference of retaliation. *Maben v. Thelen*, 887 F.3d 252, 268 (6th Cir. 2018). But "the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext." *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012). At all events, there is nothing remotely suspicious about promptly evaluating two complaints by two teachers against each other. That is all that happened.

She insists that Regano's motive must be questionable because he deprived her of notice of the allegations against her before she saw his report. But because the school district gave Ingram notice of Davis's complaint, which she confirmed over email, and interviewed her in January, no reasonable juror could make that inference.

Ingram argues that Regano's factual findings are so baseless that his stated reasons must be pretextual. But the only argument she makes—that the principal gave her permission to email Davis again—has nothing to do with Regano's decision-making, which is the crux of this claim.

6

Ingram's second theory of retaliation fails, too. Ingram proposes that, due to her February 2018 complaint against them, Regano and Bolden retaliated by improperly participating in, and thus clouding with bias, Clifford's investigation into the complaint. But all of the challenged actions taken by Regano and Bolden plainly had reasonable bases.

Recall how the two of them became involved. Clifford explained that, even though she controlled the investigation and chose whom to interview, she typically needs "a liaison" to help her schedule interviews and reserve space to conduct them. R.102-1 at 16. Bolden assumed that role. Bolden helped coordinate her interview schedule, and managed exhibits by turning over "every" available document that Clifford requested without "any resistance." R.102-1 at 31. In the words of the Taft law firm (which reviewed the Clifford investigation after Ingram's additional complaints), Bolden served as a "logistics point of contact." R.111-37 at 74. Regano took part in this investigation only by telling Bolden to handle communications with Clifford.

Both officials provided non-retaliatory reasons for their actions. As Bolden put it, when a "bus" or "computer is not working," everyone calls him, "the guy who fixes things." R.112-5 at 37–38. When Clifford needed assistance from different employees, private space for her 28 interviews, documents, emails, and other information, Bolden thus helped—not because of Ingram or her complaint—but because he is "the guy who gets the things done." R.112-5 at 38. The same is true for Regano, who stated that he delegated this work to Bolden due to his "talent" and demonstrated success as an administrator, not because of Ingram or her complaint. R.112-20 at 3–4.

Ingram frames her only response in terms of the causation element of a prima facie case, not in terms of pretext. It fails either way. She claims that "no other reason exists" for the pair's involvement aside from her naming them in her complaint. Appellant's Br. 26. A different school

7

official (say, the school district's compliance officer), she points out, could have provided Clifford with necessary logistical support. Because that official did not handle these ministerial and administrative tasks, she claims, Regano and Bolden must have "deliberately kept [her] away from the investigation." Appellant's Br. 27. That is a stretch. It is an unreasonable inference given Bolden's track record of handling these kinds of tasks. No record evidence supports it anyway. The district court correctly held that no triable issue remains on this claim.

B.

*Sex discrimination under the Fourteenth Amendment of the U.S. Constitution, Title VII, and Ohio law.* Ingram claims that Regano and Bolden discriminated against her based on sex under the federal Equal Protection Clause, Title VII, and Ohio law. As she sees it, gender bias infected the investigation of Ingram's and Davis's sexual harassment complaints and explains Regano's March 2018 decision against her.

In evaluating all three claims, we use the same test, the one used to assess Title VII sex-discrimination claims. *Boxill v. O'Grady*, 935 F.3d 510, 520 (6th Cir. 2019) (Equal Protection); *Staunch v. Cont'l Airlines, Inc.*, 511 F.3d 625, 631 (6th Cir. 2008) (Ohio law). To make out a prima facie case, Ingram must show (among other things) that the challenged actions give "rise to an inference of unlawful discrimination." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981). One way to meet this requirement—and the only way Ingram pursues—is to show that the school district treated her similarly situated male counterpart "more favorably." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016) (quotation omitted). Because she has not shown that officials treated her differently from Davis, her claim fails.

School officials followed the same investigatory process for the complaints by Davis and Ingram. Recall that Regano emailed Ingram a week before her interview to tell her that Davis

"shared some of his concerns" about the incident and that the school district intended "to conduct a thorough investigation" of "both" complaints. R.111-28 at 1. Ingram replied by thanking him for the "notice of [the] investigation." R.111-28 at 1. Before that meeting, Ingram submitted a preliminary statement. Likewise, school officials told Davis about the meeting in advance, but he chose not to submit a preliminary statement. In their interviews, officials followed the same general format.

Each teacher had the chance to tell his or her side of the story. Ingram claimed, for instance, that Davis had become "extremely angry" with her and "glared" at her. R.111-40 at 10. Davis explained, for instance, that, after he asked Ingram to stop communicating with him, she "started sending more emails." R.111-39 at 2. Both Ingram and Bolden responded to the other side's allegations: Davis by asserting that there was "[n]ever a single time [he] was inappropriate," R.111-39 at 6, Ingram by asserting that she sent him her "big email," in which she confessed her attraction to Davis (and to which he never replied) to "trick him" and prompt an investigation, R.111-40 at 13. Both parties had the opportunity to propose resolutions for the dispute. Davis wanted Ingram to "go away," R.111-39 at 6, and Ingram wanted to keep working at the school. Through all of this process, Ingram has not identified any material ways in which the officials subjected her to worse, or for that matter different, investigatory processes than those Davis received.

Ingram resists this conclusion on the grounds that a triable issue remains as to whether Regano investigated harassment allegations made by female employees in a different way from the approach he used for allegations by male employees. As evidence, she points to a 2012 email from a female employee resigning due to "harassing" conduct and a 2017 email from another female employee claiming that Bolden yelled at her about a curriculum disagreement. R.115-59

9

at 1. She claims that both complaints went unaddressed. True or not, this allegation does not tell us anything about what happened here. The relevant question is how the school district treated Ingram. The undisputed evidence shows that the school district respected Ingram's serial complaints in more ways than one. Regano and Bolden investigated her initial complaint. Clifford, an independent investigator, looked at her second complaint. And the Taft law firm, another independent investigator, looked at her next five complaints. Ingram cannot prove that she suffered a biased investigation on the ground that the complaints of two employees over the past several years allegedly failed to trigger an investigatory process.

Ingram adds that "no one ever told male employees" to "soothe the ego[]" of another employee, as she claims the principal instructed her to do for Davis. Appellant's Br. 50. But that (alleged) statement came from the principal, not from Regano or Bolden. True or not, it thus does not give rise to an inference of unlawful discrimination by these two defendants. *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000).

Ingram separately attempts to revive an adverse-action theory of liability that we rejected on preclusion grounds in the last appeal. *Ingram*, 2023 WL 6634262, at *3. She claims that we may now consider this theory—that the relevant adverse action stemmed not from investigatory bias but from her restriction from the school—because the Supreme Court recently lowered the bar for how much harm a Title VII plaintiff must show to establish an adverse action. *See Muldrow v. City of St. Louis*, 601 U.S. 346 (2024). This argument, too, falls short. Even if *Muldrow* permitted us to embrace her theory of adverse action, *see Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 885 (6th Cir. 2024) (noting that *Muldrow* calls our precedent "into doubt"), Ingram could not show that she was similarly situated to Davis, who (unlike Ingram) did not engage in misconduct and who (unlike Ingram) came out of the investigation free of work restrictions.

*Escher v. BWXT Y-12, LLC*, 627 F.3d 1020, 1029 (6th Cir. 2010) (finding "no evidence of disparate treatment" where a plaintiff failed "to show that the other employees' acts were of comparable seriousness to his own infraction" (quotation omitted)).

C.

*Tortious civil conspiracy under Ohio law*.   Ohio courts have defined a tortious civil conspiracy as a "malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages."   *Kenty v. Transamerica Premium Ins.*, 650 N.E.2d 863, 866 (Ohio 1995) (quotation omitted).   Ohio law does not recognize civil conspiracy as an independent cause of action.   *Burgess v. Fischer*, 735 F.3d 462, 483 (6th Cir. 2013).   To prevail, Ingram must show the "existence of an unlawful [tortious] act independent from the actual conspiracy."   *Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 534 (6th Cir. 2000).   Because Ingram's claims of unlawful retaliation and sex discrimination fail and because she offers no theory of tort liability, she cannot do so.

For these reasons, we affirm.