RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0131p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JARED HICKLE,

*Plaintiff-Appellant*,

*v.*

AMERICAN MULTI-CINEMA, INC.,

*Defendant-Appellee*.

No. 18-4131

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:15-cv-03068—George C. Smith, District Judge.

Decided and Filed: June 20, 2019

Before: BOGGS, MOORE, and STRANCH, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:** Peter G. Friedmann, THE FRIEDMANN FIRM LLC, Columbus, Ohio, Gregory R. Mansell, MANSELL LAW LLC, Columbus, Ohio, for Appellant. Rebecca J. Bennett, Russell T. Rendall, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., Cleveland, Ohio, for Appellee.

_____

## OPINION

_____

KAREN NELSON MOORE, Circuit Judge. In 2015, Jared Hickle was working for American Multi-Cinema, Inc. ("AMC") while also serving in the Ohio Army National Guard. AMC fired Hickle in April of that year. AMC asserts that the termination was for "unprofessional behavior" and "impeding [an] investigation"; Hickle claims that it stemmed

from AMC's anti-military animus and therefore violated his rights under the Uniformed Services Employment and Reemployment Rights Act (USERRA) and analogous Ohio law. The district court granted AMC's motion for summary judgment on Hickle's wrongful-termination claims and later entered judgment in AMC's favor. This was an error. Hickle gathered evidence during discovery that would allow a reasonable jury to find that his military service was a motivating factor in AMC's termination decision. Therefore, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.

## I. BACKGROUND

The record before us is full of disputes of fact, with the parties presenting divergent, if not wholly contradictory, accounts of crucial events. Because we are reviewing a grant of summary judgment in AMC's favor, the facts presented below are described in the light most favorable to Hickle, the non-moving party, and with all reasonable inferences drawn in his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A. Hickle's Career at AMC

Jared Hickle began working for AMC Lennox Town Center Theater in 2004, while he was still in high school. R. 29-1 (Hickle Dep. at 66) (Page ID #121). In 2006, he was promoted from crew member to Operations Coordinator at Easton Town Center Theater. *Id.* at 91 (Page ID #127). Then, in 2008, he joined the Ohio Army National Guard. *Id.* at 57 (Page ID #118). After joining the National Guard but before leaving for training, Hickle interviewed for a management position with the Easton General Manager, Tim Kalman. *Id.* at 125–27 (Page ID #135–36). During the interview, Hickle told Kalman that he was going to have to leave for military training for approximately six months; Kalman ended the interview immediately. *Id.* at 126–27 (Page ID #136). The person who got the promotion later told Hickle: "Thanks for joining the military. I just got promoted." *Id.* at 384–85 (Page ID #200).

AMC did promote Hickle to a management position when he returned from military training, and in April 2013 Hickle was promoted to Kitchen Manager at the Easton Theater. *Id.* at 112–16 (Page ID #132–33). In the interim, Hickle continued his military service, including serving for over a year in Afghanistan. *Id.* at 43–44 (Page ID #115).

Although AMC never prevented Hickle from fulfilling his military obligations or denied him time off, one Senior Manager, Jacqueline Adler, repeatedly expressed disapproval when Hickle had to take leave for military duty. First, Adler told Hickle "that [his] requesting time off was always frustrating to her," that "[i]t always put a major issue on her schedule," and "[s]he even made statements [that Hickle] should be moved to the front of house because there's more managers out there and it wouldn't be such a [headache] on her." *Id.* at 338–39 (Page ID #189).

The next negative comment from Adler happened in June 2014. *Id.* at 339 (Page ID #189). Hickle was scheduled to close on the Thursday preceding a military obligation that was set to begin on Friday. *Id.* Because closing shifts often ended well after midnight and orders could commence at midnight, Hickle could not close that Thursday. *Id.* at 102–03, 339–40 (Page ID #130, 189). When he told that to Adler, she told him that he "need[ed] to find another job, as [he] no longer met the . . . minimum qualifications for being employed at AMC."**[1]** *Id.* at 339–40 (Page ID #189). He reported this comment to Kalman, the General Manager, who said "he would take care of it." *Id.*

When Hickle returned from his military obligation, he requested a meeting with Kalman and Adler about Adler's comments, and during that meeting Hickle provided Kalman with a pamphlet on USERRA obligations. *Id.* at 380–82 (Page ID #199–200). Hickle wanted to ensure he would not be retaliated against for his service. *Id.* at 381 (Page ID #199). When Hickle gave Kalman the pamphlet, Kalman asked Hickle why he was giving it to Kalman, to which Hickle responded, "I just wanted you to have it"; Kalman then asked Hickle whether he had ever denied Hickle time off, to which Hickle responded "[n]o, I just want you to have it." R. 36 (Kalman Dep. at 86) (Page ID #1079). Kalman never attended any AMC training on USERRA compliance or asked for information on USERRA compliance. *Id.* at 87 (Page ID #1080). He knew that AMC "need[ed] to honor their [sic] days off," but "never . . . asked for specifics." *Id.*

---

**[1]**Adler denied threatening Hickle's job and claims that she told him only that he had "to figure out how to make it both work." R. 34 (Adler Dep. at 39–40) (Page ID #909). Whether to believe Adler or Hickle's version of events is, of course, a question of fact for the jury; it is worth noting, however, that Adler's version—that she told Hickle that he would have to figure out how "to make it both work"—is milder than a direct threat, but not free of discriminatory implications.

Adler continued to insinuate that Hickle could or should be fired for taking time off for military duty. In February 2015, as Hickle was requesting time off for a military obligation, Adler commented that Hickle was "taking off the whole summer" and "[w]e just need to get [Hickle] replaced." R. 29-1 (Hickle Dep. at 341) (Page ID #189).

**B. April 2015**

Adler's final relevant statement was a direct threat to Hickle's job, made the same month he was fired. In April 2015, Hickle was talking with Adler and a co-worker, Jeff Keeton, about upcoming movie releases. *Id.* at 327–28 (Page ID #186). Conversation turned to the upcoming "Avengers weekend,"[2] which was expected to draw large crowds to the theater; Hickle reminded Adler that he would be gone that weekend because of a military drill. *Id.* at 328 (Page ID #186). Adler told Hickle that he would be fired if he missed that weekend. *Id.* When Hickle said that firing him for missing work due to military obligations would be illegal, Adler responded by saying "that's okay. We will find something else to terminate you on."[3] *Id.* Keeton heard Adler tell Hickle that requesting time off "would not be possible because it would be a busy weekend and [Hickle] could be terminated," and Keeton thought Adler's threat to fire Hickle was "serious." R. 35 (Keeton Dep. at 11–12) (Page ID #956–57).

We turn next to the end of Hickle's shift that began on Friday, April 17, 2015 and ended in what the defendant refers to as the "chicken finger incident." R. 33-3 (Apr. 17, 2015 Hickle Statement) (Page ID #846); Appellee Br. at 4. As Kitchen Manager, Hickle was responsible for supervising the employees who worked in the AMC kitchen. According to Hickle, one of the employees, Dominique Washington, told him that another employee, Quinton Branham, had asked her to make extra food so that Branham could take the food home at the end of the night, but she refused. R. 33-3 (Apr. 17, 2015 Hickle Statement) (Page ID #846); *see also* R. 30-1 (Washington Statement) (Page ID #525). After the kitchen closed, Hickle found a to-go

---

[2]Avengers: Age of Ultron premiered on May 1, 2015 and earned approximately $191 million in the United States in its opening weekend. *Avengers: Age of Ultron*, IMDB, https://www.imdb.com/title/tt2395427/ (last visited May 9, 2019).

[3]AMC argues that Adler was joking, and that Hickle understood that to be so. Appellee Br. at 16–20. Whether Adler was joking is a question of fact that cannot be resolved as a matter of law.

container with ten chicken fingers in it (more than the amount an employee was allowed to take home for a shift meal). Branham said it was his but that he did not make the extra chicken fingers illicitly. R. 33-3 (Apr. 17, 2015 Hickle Statement) (Page ID #846); *see also* R. 29-1 (Hickle Dep. at 172) (Page ID #147). Rather, Branham claimed that the extra fingers were abandoned and otherwise would have been thrown out. R. 33-3 (Apr. 17, 2015 Hickle Statement) (Page ID #846–47). Branham then began cursing and speaking inappropriately toward Hickle; Hickle asserts that he did not lose his temper or otherwise act unprofessionally toward Branham, although Branham reported otherwise to AMC. *Id.*; R. 30-1 (Branham Statements) (Page ID #518–23). Hickle then told the other employees that they could not take food home that night and instead should take a break to eat their meals at the theater. One employee, Dwight Williams, objected to Hickle's command and started cursing at Hickle and otherwise acting disrespectfully. R. 33-3 (Apr. 17, 2015 Hickle Statement) (Page ID #846–47); *see also* R. 30-1 (Williams Statement) (Page ID #533). Again, Hickle maintains he did not respond in kind, although Williams reported otherwise to AMC. R. 33-3 (Apr. 17, 2015 Hickle Statement) (Page ID #846–47); R. 30-1 (Williams Statement) (Page ID #533). Hickle typed up a statement of events before he went home for the night. R. 33-3 (Apr. 17, 2015 Hickle Statement) (Page ID #846–47). Branham and Williams were eventually terminated for their part in the incident. R. 29-1 (Hickle Dep. at 272) (Page ID #172).

The next day, April 18, 2015, a co-worker named Ricky Jones told Hickle that Adler was trying to get Hickle fired. R. 33-6 (Apr. 19, 2015 Hickle Statement) (Page ID #850). Adler, as a Senior Manager, did not have the authority to terminate Hickle. She was plotting, according to Jones, to get Hickle fired by having employees write complaints about Hickle that would be sent to AMC headquarters, eventually causing Hickle's termination. *Id.* Jones also mentioned a plot to have someone get into an argument with Hickle in front of other staff members so that others could "write the same statement with a story they had concocted beforehand . . . [to] ensure that [Hickle] would be terminated," but there was no suggestion that any such plan came to fruition. *Id.* Though Jones's written statement does not mention Adler as the mastermind of the plot, R. 32-2 (Jones Statement) (Page ID #747), Hickle recalls that Jones specifically told him that "it was Jackie's plot." R. 29-1 (Hickle Dep.) (Page ID #174). Two other employees told Hickle about this plot as well: Dominique Washington, whom Hickle did not prompt to write a

statement about the plot, and Steven Givens, who did write a statement for Hickle. R. 29-1 (Hickle Dep. at 288–90) (Page ID #176–77); R. 33-7 (Givens Statement) (Page ID #852). Givens's statement attributes the plot to Adler. R. 33-7 (Givens Statement) (Page ID #852). Hickle asked Givens for a statement because Hickle had earlier texted Adler about the plot and Adler told him that "if they are telling the truth u [sic] need all of them to write statements tonight." R. 33-8 (Text Messages) (Page ID #857–58).

## C. The Termination

While Hickle was investigating the Adler plot, AMC was investigating Hickle. After the chicken-finger incident, Tim Kalman, the General Manager, contacted AMC's Compliance Manager, Mary Melton-Miller, who initiated an investigation. R. 31-1 (Melton-Miller Dep. at 21) (Page ID #551).

To understand what followed, a brief detour into AMC's organizational structure is necessary. Kitchen Manager, Hickle's last title at AMC, is a management position in the middle of the AMC organizational chart. *See* R. 29-1 (Hickle Dep. at Ex. B (Page ID #272). Because AMC Easton is a "dine-in" theater, the employees are divided between "front of house" (roughly, those employees with whom customers would interact) and "back of house" (those whose work is not customer-facing, such as kitchen staff). *Id*. at 146–47 (Page ID #141). Aside from "film crew"—the general employees—the lowest supervisory position on the organizational chart is front-of-house or back-of-house supervisor. *Id.* at Ex. B (Page ID #272). Next come the managers of various sectors, of which Hickle was one. In other words, Hickle, as a Kitchen Manager, supervised the back-of-house supervisors and crew. *Id.* Kitchen Managers are supervised by a Senior Manager for back-of-house, who is in turn supervised by the sole General Manager. *Id.* Finally, the General Manager reports to AMC corporate staff. The General Manager has the authority to fire film crew but not to fire a manager. R. 36 (Kalman Dep. at 11) (Page ID #1004). As to managers, the General Manager can initiate an investigation into the employee's conduct that AMC corporate's compliance office performs, but the General Manager does not have the independent authority to fire a manager. *Id.* at 19–20 (Page ID #1012–13). Rather, a corporate adjudicator makes the final decision on managerial terminations. R. 30-1 (Keana Bradley Dep. at 22, 24) (Page ID #485).

Returning to Hickle and the Easton theater: neither Adler (a Senior Manager) nor Kalman (the General Manager) had independent authority to fire Hickle. Kalman, though, had authority to, and did, initiate an investigation into Hickle's conduct. That investigation was performed by a Compliance Manager, Mary Melton-Miller. Her conclusions were then passed to an adjudicator—here, Keana Bradley—who made the ultimate decision. Although Kalman did not have decisionmaking authority, both Melton-Miller and Bradley testified to his involvement in the process. R. 31-1 (Melton-Miller Dep. at 13) (Page ID #549) ("The general manager and myself were partnering [in the investigation.]"); R. 30-1 (Bradley Dep. at 31) (Page ID #487) ("I always ask the general manager what their recommendation is. . . . [S]ince I'm not there . . . to work with this person every day, I always get the general manager's opinion."). Bradley testified that Kalman recommended that AMC "part ways" with Hickle; Kalman says that no one asked him about Hickle's performance. R. 30-1 (Bradley Dep. at 31) (Page ID #487); R. 36 (Kalman Dep. at 63) (Page ID #1056).

Once Kalman initiated the investigation, Hickle was suspended pending the results of the investigation. He received notice of the suspension on April 21 via a call from Melton-Miller. R. 29-1 (Hickle Dep. at 319) (Page ID #184). He requested an opportunity to speak privately with her, and they had a phone conversation the next day. *Id.* at 276, 325–26 (Page ID #173, 185–86); R. 31-1 (Melton-Miller Dep. at 26–27) (Page ID #553). Hickle told Melton-Miller about the various comments Adler made threatening to get him fired for taking military leave and about the plot to get him fired. R. 31-1 (Melton-Miller Dep. at 37–50 (Page ID #555–59). At her deposition, Melton-Miller said that such discrimination would "concern" her and that she investigated it, but also, during the phone conversation with Hickle, she asked him why he was "telling [her] about it now," because "[i]f nothing ever took place, if [AMC] never denied [Hickle] the USERRA, why are we talking about it?" *Id.* at 40 (Page ID #556).

At the close of her investigation, Melton-Miller sent various people, including Kalman and Bradley, an e-mail with the subject line "Subject: #10704 / Hickle, Jared (KM) / Easton / Suspended / Unprofessional behavior / Impeding the investigation / Investigation Completed." R. 33-9 (E-mails) (Page ID #863). The e-mail contained a list of facts that were "substantiated" during the allegation. *Id.* These were not, Melton-Miller seems to insist, necessarily the reasons

for which Hickle was terminated. *See* R. 31-1 (Melton-Miller Dep. at 68–75) (Page ID #563–65) ("Q: I don't understand how this [item on the list] is a negative factor for Jared. Maybe you can explain to me why this is of significance? [Melton-Miller]: I didn't say it was a negative."). Bradley, who made the decision to terminate Hickle, said that her decision was based on "the entire case," and told Hickle that his termination was based on "confidentiality," "impeding the investigation," and "just his overall behavior and demeanor." R. 30-1 (Bradley Dep. at 32, 40) (Page ID #487, 489).

Hickle now claims that he was wrongfully terminated in violation of USERRA and Ohio law. R. 2 (Amended Compl. at 8–9) (Page ID #20–21). The district court granted summary judgment in favor of the defendant on the wrongful-termination claims[4] and entered judgment in favor of AMC. *Hickle v. American Multi-Cinema, Inc.*, 296 F. Supp. 3d 879, 892 (S.D. Ohio 2017); R. 52 (Oct. 12, 2018 Order) (Page ID #1208). This appeal followed.

## II. ANALYSIS

We review de novo a district court's grant of summary judgment. *Savage v. Fed. Express Corp.*, 856 F.3d 440, 446 (6th Cir. 2017). Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits accrued during discovery demonstrate "that there is no genuine dispute as to any material fact" to present to a jury. Fed. R. Civ. P. 56(a), (c). The moving party—here, AMC—has the burden of showing that no such genuine dispute of fact exists, even with evidence presented in the light most favorable to the non-moving party—here, Hickle—and with all inferences drawn in his favor. *See Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 748 (6th Cir. 2012). In deciding a motion for summary judgment, we do not engage in "jury functions" such as making credibility determinations and weighing the evidence. *Id.* (quoting *Anderson*, 477 U.S. at 255). If there remains any material factual disagreement as to a particular legal claim, that claim must be submitted to a jury. *Id.*

---

[4]The decision denied summary judgment regarding Hickle's failure-to-promote claims. *Hickle*, 296 F. Supp. 3d at 892. The parties later stipulated to an amendment of the complaint excising those claims, which allowed the district court to enter final judgment in favor of the defendant. R. 51 (Joint Stip. to Amend the Compl.) (Page ID #1205).

Hickle presents to the court claims of wrongful termination under USERRA, 38 U.S.C. § 4311, and Ohio law that forbids an employer to discriminate based on military status, Oh. Rev. Code § 4112.02(A). The parties do not contest the district court's use of the USERRA framework to determine the Ohio law claims. *See Hickle*, 296 F. Supp. 3d at 891–92.

USERRA protects "[a] person who is a member of . . . or has an obligation to perform service in a uniformed service" from being "denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership . . . or obligation." 38 U.S.C. § 4311(a). "An employer shall be considered to have engaged in actions prohibited [by USERRA] . . . if the person's membership . . . or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership . . . or obligation for service." *Id.* § 4311(c)(1).

We use a two-step process to evaluate claims of discrimination in violation of USERRA. *Savage*, 856 F.3d at 447. The plaintiff must first make out a prima facie case of discrimination "by showing, by a preponderance of the evidence, that his protected status was a substantial or motivating factor in the adverse employment action." *Id.* (quoting *Petty v. Metro Gov't of Nashville-Davidson Cty.*, 538 F.3d 431, 446 (6th Cir. 2008)). If the plaintiff establishes a prima facie case of discrimination, "the employer then has the opportunity to come forward with evidence to show, by a preponderance of the evidence, that the employer would have taken the adverse action anyway, for a valid reason." *Id.* (quoting *Hance v. Norfolk Southern Ry. Co.*, 571 F.3d 511, 518 (6th Cir. 2009)).

## A.  Hickle's Prima Facie Case

A plaintiff can present a prima facie case of discrimination using either direct or circumstantial evidence. *Bobo*, 665 F.3d at 755. We turn first to Hickle's direct evidence.

### 1.  Direct Evidence

The district court reached two incorrect conclusions that led it to hold that Hickle "has not offered any direct evidence of discrimination on the basis of his military activity." *Hickle*,

296 F. Supp. 3d at 887.  First, it erred when it concluded that, because Adler did not have the authority to fire Hickle, Hickle could have proceeded only under the cat's paw theory.  *Id.* at 886.  In fact, Hickle does have evidence that ties some people involved in the termination decision to Adler's discriminatory comments.  The decisionmaker (Bradley) and those with direct input (Kalman and Melton-Miller) knew about Adler's persistent, discriminatory comments.  Hickle repeatedly complained to Kalman, who had direct input into the termination decision, about Adler's behavior.  Furthermore, the actual decisionmaker (Bradley) knew that Hickle had heard that Adler was conspiring to get him fired, and knew that Adler told Hickle to gather employees' statements.  R. 30-1 (Bradley Dep. at 32–35, 37–38) (Page ID #487–89).  In sum, the decisionmaker knew that Hickle was told to commit a fireable offense—gathering statements and thereby impeding an investigation—by someone Hickle had repeatedly said had made discriminatory comments threatening his job.  Yet the decisionmaker chose to fire Hickle.

In *Bobo*, we found sufficient direct evidence to constitute a prima facie case in remarkably similar circumstances.  There, a direct supervisor (Morton) without the authority to terminate employees expressed disapproval of the plaintiff-employee's military obligations, including writing a memorandum saying that he "did not want [the employee] volunteering for additional military duty when he was needed at [work.]"  665 F.3d at 744.  That memorandum was read by Morton's supervisor, Wagner.  *Id.* at 755.  Bobo, the plaintiff-employee, also engaged Wagner in conversations about his military leave.  *Id.*  Wagner was present at the meeting where managers decided to terminate Bobo.  *Id.*  Replace "Morton" with "Adler" and "Wagner" with "Kalman," and the facts would match almost exactly what occurred here.  We found direct evidence of a USERRA violation in *Bobo*, and we do so here, too.

Next, the district court erred by finding that Hickle could not make out a claim under the "cat's paw" theory of liability.  *Hickle*, 296 F. Supp. 3d at 887.  The "cat's paw" theory of liability, endorsed by the Supreme Court in *Staub v. Proctor Hospital*, 562 U.S. 411 (2011), deals with the realities of highly stratified workplaces.  In *Staub*, the Court held that "if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA."  *Id.* at 422 (footnote omitted).

The district court held that Hickle could not proceed under the cat's-paw theory because he "has not offered any evidence that Adler issued [the direction to obtain statements relating to the conspiracy plot] with the *intention* of causing Plaintiff's termination." *Hickle*, 296 F. Supp. 3d at 886. This was an error.

Hickle offered evidence that Adler persistently made anti-military comments, up to and including threatening to get him fired for "something else" when Hickle had to miss the Avengers weekend for military duty. He offered evidence that she was, in fact, plotting to get him fired. This evidence is more than sufficient for a reasonable jury to infer that Adler intended to cause Hickle's termination. The district court cited language in Hickle's initial text to Adler to reach a different conclusion, but that was an error because the district court ignored the context of the text messages. When Hickle was first alerting Adler to the fact that someone told him about Adler's plot, he said he didn't believe it, "but it's part of what all three people told me that supervisors told them." R. 33-8 (Text Messages) (Page ID #853). This does not mean, as the district court concluded, that at the time Hickle did not feel Adler was trying to get him fired; rather, it is an example of an employee trying to be diplomatic with his supervisor. Hickle said as much in his deposition. R. 29-1 (Hickle Dep. at 287) (Page ID #176) ("I didn't want Jackie to retaliate against me and become upset. I did want her to know that I did hear about this plot and that I was aware of it."). The district court ignored its mandate to construe the evidence in the light most favorable to Hickle by ignoring Hickle's deposition testimony that offers a reasonable explanation why he did not accuse Adler immediately of plotting against him.

Having shown that evidence exists that Adler intended to cause Hickle's termination, we must address whether Adler's act was the proximate cause of Hickle's termination. The record shows that this is a question for a jury to decide. Certainly, the chicken-finger incident and the issues of Hickle's demeanor, communication, and professionalism were part of the investigation and cited by Bradley as a reason for termination. Bradley stated in her deposition, however, that she made her decision based on all the findings presented and singled out "impeding the investigation" as a reason. Nevertheless, the defendant insists that it broke the chain of causation by conducting a thorough and independent investigation.

We disagree. First, as best as we can tell[5], the investigation consisted mostly of gathering statements from a few employees, and was not necessarily thorough. For example, Melton-Miller said she could not locate any witnesses to Adler's threat to terminate Hickle, when in fact Keeton was a party to the conversation. R. 31-1 (Melton-Miller Dep. at 39) (Page ID #556). Hickle went so far as to email Bradley about the shortcomings of the investigation, saying it was "concerning to [him] that [Melton-Miller] did not ask for any statements" about the USERRA issues he presented. R. 33-10 (May 11, 2015 Email) (Page ID #865–66). Second, the investigation was not necessarily independent; for example, Melton-Miller described Kalman as her "partner" in the investigation. Finally, as a matter of general policy, we should bear in mind why the cat's-paw doctrine exists: in stratified workplaces, such as AMC, biased direct supervisors who lack firing authority can easily influence those who have such authority to take adverse actions. AMC points to its own extremely stratified termination procedure in an attempt to insulate itself from liability, when in fact its procedure demonstrates circumstances in which a biased direct supervisor can make a "cat's paw" of upper management.

## 2. Circumstantial Evidence

Even if Hickle did not have direct evidence of discriminatory intent, he also presented circumstantial evidence that suggests AMC was motivated by anti-military animus. The district court correctly concluded that Hickle made out a prima facie case of discrimination by circumstantial evidence. It focused, correctly also, on AMC's inability to present a cogent explanation of its "impeding the investigation" allegation. *Hickle*, 296 F. Supp. 3d at 887. Therefore we pause only to mention that, unlike the district court, we do not consider this a "close question." *Id.* at 888. The district court thought it strong evidence in AMC's favor that AMC had never denied Hickle's requests to take time off for military obligations. We do not find this fact to be determinative, as there could be numerous situations in which an employer would grant requests for military leave (albeit grudgingly) for years and nevertheless finally wrongfully terminate an employee for taking such leave. Certainly, granting Hickle's leave requests helps AMC's case, but it does not insulate AMC from charges of retaliation.

---

[5]The Melton-Miller deposition is opaque and so confusing as to verge on nonsensical.

**B.  AMC's Rebuttal**

Because Hickle made out a prima facie case of discrimination, AMC has the burden of showing that it would have terminated Hickle even absent his military service.  It cannot do so.  The district court pointed to the chicken-finger incident to conclude that "AMC has therefore carried its burden to establish that it made 'a reasonably informed and considered decision before taking an adverse employment action.'"  *Id.* at 889 (quoting *Escher v. BWXT Y-12, LLC*, 627 F.3d 1020, 1030 (6th Cir. 2010)).  As discussed above, however, it remains an open question whether the decisionmaker relied solely on the chicken-finger incident in deciding to terminate Hickle, and whether she would have reached the same conclusion in the absence of the charges of impeding the investigation.

*Escher*, which the district court cites, is inapposite; in that case, the decisionmaker did not know of the plaintiff's complaints about military leave, conducted a thorough investigation, and concluded that termination was necessary based solely on nondiscriminatory reasons.  627 F.3d at 1030–31.  Here, Bradley knew of Hickle's USERRA complaints and knew that Adler told Hickle to take action that would amount to impeding the investigation; nevertheless, Bradley seems to have considered the charge of impeding the investigation relevant to the decision.  Thus, the honest-belief rule does not help the defendant.  The "particularized facts that were before [the employer] at the time the decision was made," *Escher*, 627 F.3d at 1030 (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006)), included Adler's anti-military comments and her text to Hickle telling him to collect statements.  This was not a case in which the decisionmaker was acting on a clean record and in ignorance of lurking discriminatory motives.  The decisionmaker was fully aware of the facts suggesting that the "impeding the investigation" charge was pretextual.  In sum, a jury could conclude, based on this set of facts, that taking military leave, a protected act under federal and Ohio law, was a motivating factor in AMC's decision to terminate his employment.

## III.  CONCLUSION

For the reasons stated above, we **REVERSE** the district court's judgment and **REMAND** for further proceedings consistent with this decision.