NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0496n.06
No. 19-6340

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

JASON RAGLAND,

    Plaintiff-Appellant,

v.

BM2 FREIGHT SERVICES, INC.

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)

**FILED**
Aug 24, 2020
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF KENTUCKY

---

**BEFORE: CLAY, WHITE, and READLER, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Plaintiff-Appellant Jason Ragland appeals from the district court's order granting summary judgment to Defendant-Appellee BM2 Freight Services, Inc. (BM2) on Ragland's claim of employment discrimination under the Uniformed Services Employment and Reemployment Rights Act (USERRA). Because we agree with the district court that Ragland has not established a prima facie case of discrimination, we **AFFIRM**.

I.

Jason Ragland served in the U.S. Marine Corps from 1999 to 2004. From 2005 to the middle of 2008, Ragland worked for the Department of State's Bureau of Diplomatic Security and served in combat duty in Iraq. Following his service with the Department of State, Ragland started his own business, International Stability Solutions, doing procurement work for the U.S. military. In 2012, Ragland moved back to Cincinnati and reconnected with a friend who owned a freight business. Ragland expressed interest in working in the freight logistics industry, but his friend's

business did not provide training and therefore hired only experienced employees. So, the friend referred Ragland to BM2.

BM2 is a freight brokerage company operating throughout the United States and Canada. At its core, BM2's business model connects clients needing to ship goods with carriers who can haul those loads. BM2 was founded in 2008 by its owners, Kevin Ball and brothers Matthew and Jeff Mason, and has around 36 employees.

Kevin Ball and Matthew Mason interviewed Ragland, and the company hired him in October 2012. During the interview, Ragland was asked about his prior military experience. Kevin Ball testified that Ragland's "veteran status is what got him in the door" because Ball had great respect for veterans and their work ethic, and the company was hoping to secure government contracts in the future and believed that Ragland's prior experience would help them do so. *See, e.g.*, R. 30-1, PID 844.

Ragland initially served as an assistant to an account executive so that he could get "on-the-job training." R. 26-1, PID 250-51. Following a year of training, Ragland became an account executive and the company provided him with a list of customers to service, including a federal government account. Ragland later became a senior account executive in part because he excelled at producing business for the company. In fact, he and another employee, Jess Meloche, often competed for the top ranking in sales. In January 2016, BM2 selected Ragland along with three other employees to be "team leads." R. 28-1, PID 566. BM2's three owners and Scott Klever, BM2's newly hired Vice President of Business Development and Ragland's supervisor, made this decision.

Ragland's employment was terminated by phone on May 17, 2016. The parties dispute the import of events leading up to Ragland's termination. Ragland contends that despite his earnings

success, lack of previous formal discipline, and BM2's positive views of Ragland's leadership abilities, he was abruptly fired for disrespecting his supervisor during a contentious meeting on May 16, 2016 that overflowed into May 17, 2016 and that the firing was based on his veteran status. BM2 contends that the events of May 16th and 17th were "the straw that broke the camel's back," R. 30-1, PID 741, and that Ragland's termination was because of a string of incidents that demonstrated an increasingly negative attitude toward co-workers and management that was harmful to the company's culture. We describe the most relevant events below.

A.

On March 21, 2016, Ball sent Ragland an email asking whether Ragland submitted a bid to GSA for a government account that had been assigned to him. Ragland responded that he had not, and Ball asked why. After a lengthy back-and-forth email discussion between the two, Ragland wrote to Ball, complaining that he felt he was being "attacked" for not bidding on the job. R. 30-10, PID 939. Ball responded that Ragland was not "getting attacked," and that Ball was merely inquiring why an account that Ragland was "handpicked for" "ha[d]n't generated a dollar's worth of revenue in 3 years." *Id.* Ball testified that he viewed Ragland's defensive responses as an example of Ragland's insubordination.

Around the same time, BM2's management "decided that they had become lax about enforcing the 8:00 a.m. start time for employees and that it sent the wrong message." R. 41, PID 1334. Ball sent out a company-wide email stating that all employees would be required to start work at 8:00 a.m. Ball testified that BM2 had hired consultants to help the company build a positive culture,[1] and he viewed this as a way to get "everybody rowing the boat in the same

---

[1] Matthew Mason testified similarly that the company was concerned about negativity in the workplace and the culture of the company, and that the newly hired consultants "pounded the drum of culture" and encouraged the owners to address any "entities in [their] organization that have a negative effect on [its] culture." R. 28-1, PID 594-

direction and everybody being on the same page." R. 30-1, PID 705. After a HR representative confirmed that the policy would be strictly enforced, Ragland emailed Matthew Mason asking to speak to him about the new policy. In the email, Ragland explained that he felt that he does "a damn good job at managing [his] accounts and [he] would appreciate some flexibility"; that he "personally [felt] that this is a perk of working hard and being successful"; and that even though, "[o]bviously there are a lot of people that are under performing, [he didn't] want to be categorized with everyone else when he [had] worked [his] ass off" for BM2. R. 30-11, PID 944. The following day, Ball sent another email noting that the new policy had been "met with some discord" but that it was "non-negotiable" regardless of an employee's "numbers" or "position." R. 30-9, PID 937.[2] Echoing the company's concern about building a positive culture, Ball noted that "morale in one's company and one's job shouldn't be tied to what time they have to come in to work" and that "if the morale we have here and the teamwork is based on the fact that we have never cared about what time people show up, then it was false morale anyway." R. 30-9, PID 937.

In May 2016, BM2 fired account manager Tyler Reed. Klever and Ball met with the four team leads (Ragland, Meloche, Evan Egan, and Liz[3]) to inform them that Reed's employment had been terminated and that Reed's "big accounts were getting divvied to us and then the rest would go to everybody else." R. 26-1, PID 305. Meloche testified that Klever and Ball discussed with the four leads "what accounts might go with each person, what—who might fit with each" and that some names were written down beside some of the accounts. R. 22-1, PID 169. He also recalls

---

95. The owners also testified that they had discussed Ragland's negative effect on BM2's culture at several weekly owner meetings.

[2] BM2's owners testified that various employees reported to them that Ragland made comments around this time that the owners did not know what they were doing and were disconnected from the operations on the floor. Ragland testified that he did not recall making these comments, but he stated that if he or other employees did express their discontent, this "mass punishment" email would likely explain why. R. 26-1, PID 292.

[3] Liz's last name does not appear in the record.

that these were not finalized assignments, but rather were notations reflecting that "these might be good for each person, not necessarily that they were ours." *Id.* at PID 175.

On May 16, 2016, Klever began "walking around to everybody and giving out the customers to them." R. 26-1, PID 306. However, by 5:00 p.m., Klever had not given Ragland any new customers. Because Ragland could not find Klever at that time, he sent a text to Klever asking which of Reed's customers he was getting. Shortly thereafter, Klever returned to the office. By this point, Ragland had printed a list of Reed's customers, including the revenue that each customer generated. He found Klever and the two went into Ball's empty office to talk. Klever told Ragland that BM2 management believed that "the accounts that generate the least amount of revenue are the biggest accounts, so we're going to give you some of those." *Id.* at PID 307. After hearing this news, Ragland took the piece of paper showing Reed's accounts, crumpled it, threw in into a trash can and left the office, exclaiming that he didn't understand why he kept "getting treated like shit." *Id.* at PID 309.

Meloche, whose desk was right outside Ball's office, recalled this event. He testified that although he does not remember the exact language, he does recall that Ragland crumpled the paper, threw it onto the desk where Klever was sitting, and "said something to the effect of 'I guess this is garbage anyway,' because he didn't get the prospects that had been discussed on that paper." R. 22-1, PID 171. Meloche remembers thinking that "this [was] it," that "Jason was done" and was either "[q]uitting or was going to be fired" because "if you take a list of prospects that an owner or a VP gives you and you toss it in their face, you know, crumpling it up, that's pretty much saying bye." *Id.* at PID 172. Meloche, the only other lead who was deposed, testified that he too was not given any of Reed's accounts, and thinks the most likely reason is that, as a top earner in the company, he was "busy enough with [his] own stuff." *Id.* at PID 168.

The following day, May 17, 2016, Klever approached Ragland's desk, and, according to Meloche, "very rudely told [Ragland] to stand up," cursed, and told him to "[l]ook [him] in the eye like a man." *Id.* at PID 177-78. Ragland remained calm during this conversation. Afterward, Ragland walked into Matthew Mason's office and told Mason that he was going to work from home for the day because he wasn't going to "stay here when someone is aggressively getting in [his] face like that" and told Mason to "call me when you take care of it." R. 26-1, PID 323. Mason testified that he learned about the heated conversation between Ragland and Klever that morning, and that Ragland came into his office to say that he was going home "like . . . a minute" after Klever left Mason's office to go talk to Ragland about his disrespectful behavior the day before. R. 28-1, PID 584-85. Mason told Ragland "you do what you have to do" because he did not feel like dealing with "more drama and more—more negativity." *Id.* at PID 581.

While driving home, Ragland called Jeff Mason (who was driving into the office) to tell him what had just occurred with Klever. Jeff Mason testified that during this conversation, Ragland mentioned that he wished he could work directly with Jeff Mason and "that either Matt or Kevin or Scott, that they—basically that he didn't like how they operated, that they—that they didn't know what they were doing and he wanted to work with me." R. 21-1, PID 116.

Jeff Mason arrived at the office and he, Matthew Mason and Kevin Ball went into the conference room so that Mason and Ball could update him about what had transpired the day before and that morning. The owners decided to terminate Ragland's employment, and Ball called Ragland and informed him that he was fired. Ball recalled that in the brief phone conversation, he mentioned that Ragland's termination was for insubordination but did not remember any other reasons he gave.

A week or two after Ragland's termination, BM2's owners had a company-wide meeting. According to Meloche, the message in the meeting was:

> "Hey, we want everybody to try hard to bring in money, but there's more to it than that," something to the effect of they thought Jason was bringing other employees down and making them feel more negatively about the company, which is the reason we were given for him being let go. He was bringing—making the culture negative.

R. 22-1, PID 183. Meloche testified that all the owners mentioned Jason's negativity and that even some of his fellow co-workers agreed with the owners' impressions after this meeting.

B.

Ragland brought this action against BM2, alleging a claim of veteran discrimination under the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA), 38 U.S.C. § 4311, and a claim of disability discrimination under the Americans with Disabilities Act (ADA). The district court granted BM2's motion for summary judgment on both claims. As to the ADA claim, Ragland contended that BM2's owners regarded him as having PTSD from his prior military experience. The district court concluded that there was no evidence that any of BM2's owners regarded Ragland as having PTSD. Ragland does not challenge the dismissal of his ADA discrimination claim on appeal. Therefore, the only question on appeal is whether the district court properly granted summary judgment in BM2's favor on Ragland's claim of veteran discrimination under USERRA.

II.

"We review a district court's grant of summary judgment de novo, viewing all the evidence in the light most favorable to the nonmoving party and drawing 'all justifiable inferences' in his favor." *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Summary judgment is proper "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(a)). "A 'material' fact is one that 'might affect the outcome of the suit under the governing law.'" *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849 (6th Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). "There is a genuine dispute of material fact if 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Marshall v. Rawlings Co.*, 854 F.3d 368, 381 (6th Cir. 2017) (quoting *Anderson*, 477 U.S. at 249).

"USERRA was enacted to prohibit discrimination against individuals because of their military service." *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 754 (6th Cir. 2012), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013). As relevant here, USERRA prohibits employers from terminating an individual's employment on the basis of the employee's military status. 38 U.S.C. § 4311(a). Unlike the tripart *McDonnell-Douglas* framework that applies in most employment discrimination cases, USERRA discrimination claims are analyzed in a two-step process. *Savage v. Fed. Express Corp.*, 856 F.3d 440, 447 (6th Cir. 2017). First, the plaintiff must "make out a prima facie case of discrimination 'by showing, by a preponderance of the evidence, that his protected status was a substantial or motivating factor in the adverse employment action.'" *Hickle v. Am. Multi-Cinema, Inc.*, 927 F.3d 945, 952 (6th Cir. 2019) (quoting *Savage*, 856 F.3d at 447). A plaintiff's veteran status is a motivating factor "if the defendant relied on, took into account, considered, or conditioned its decision on that consideration." *Petty v. Metro Gov't of Nashville-Davidson Cnty.*, 538 F.3d 431, 446 (6th Cir. 2008) (quoting *Coffman v. Chugach Support Servs.*, 411 F.3d 1231, 1238 (11th Cir. 2005)). An employee can meet this burden through direct or circumstantial evidence. To the extent the

employee relies on circumstantial evidence to establish an inference of discriminatory motivation, a number of factors are relevant, including

> proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses.

*Hance v. Norfolk S. Ry. Co.*, 571 F.3d 511, 518 (6th Cir. 2009) (per curiam) (quoting *Sheehan v. Dept' of the Navy*, 240 F.3d 1009, 1014 (Fed. Cir. 2001)). If a plaintiff meets this burden, "the employer then has the opportunity to come forward with evidence to show, by a preponderance of the evidence, that the employer would have taken the adverse action anyway, for a valid reason." *Savage*, 856 F.3d at 447 (quoting *Hance*, 571 F.3d at 518). The employer may avoid liability if it "can prove that the action would have been taken in the absence of such . . . service." 38 U.S.C. § 4311(c)(1).

The district court granted BM2 summary judgment because it concluded that "the record simply does not contain evidence from which a reasonable jury could conclude that Ragland's military service was a 'substantial or motivating factor in the adverse employment action.'" R. 41, PID 1340-41 (quoting *Hickle*, 927 F.3d at 952). On appeal, Ragland contends that the district court erred as a matter of law when it concluded that he failed to establish a prima facie case of discrimination under USERRA. Ragland asserts he has established his prima facie case on 1) evidence of BM2's anti-veteran bias, 2) inconsistencies between BM2's policies and its treatment of Ragland, 3) incongruence between the decision to fire Ragland and his previous promotions within the company, and 4) differential treatment of a non-veteran, Jess Meloche. We consider each in turn.

9

*Anti-Military Bias*

Ragland contends that BM2's owners regarded him as having PTSD as a result of his prior military service and fired him because they were afraid that he was "mentally unstable" as a result. Appellant Br. at 11. In support of this claim, Ragland testified that during his employment at BM2, several co-workers, an HR manager, and Klever asked him about his experiences in the military, including whether he had killed anybody and whether he had PTSD or any issues from his past military service. Although Ragland found the questions to be "weird" and "awkward," he always answered "no" when asked whether he had PTSD and testified that he understood that people could be curious about what his past service entailed. R. 26-1, PID 343-44.

Ragland now asserts that these questions support an inference that BM2's owners terminated his employment because of his military service. We disagree. First, there is no evidence that any of BM2's three owners—who made the decision to fire Ragland—ever asked Ragland whether he had PTSD or regarded Ragland as having PTSD. And the record is otherwise devoid of evidence from which a jury could infer that Ragland's being fired was due in part to belief that he had PTSD. This leaves only Ragland's conjecture that because BM2 employees asked about his prior military service and whether he had PTSD, "the owners of this small company [also] shared this unusual curiosity about Mr. Ragland's mental health."[4] Appellant Br. at 14. However, "personal beliefs, conjecture and speculation are insufficient to support an inference" of discrimination. *Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 268 (6th Cir. 1986). In addition, the undisputed evidence demonstrates that Ragland's military service was viewed

---

[4] We note that Ragland's argument is in reality a three-part inference: 1) because BM2 employees asked Ragland about whether he had mental-health issues from his military service, BM2's owners must also have had these same questions, 2) such questions indicate that these individuals (and BM2's owners) were fearful of Ragland, and 3) because they felt threatened by him, they took adverse action against him. The record, however, is devoid of evidence sufficient to support any of these inferences.

positively by BM2's owners and refutes Ragland's allegation of anti-military bias.  Indeed, his military service "got him in the door." R. 30-1, PID 844.  In short, the record would not allow a reasonable fact-finder to conclude that BM2's owners terminated Ragland's employment because they believed he had PTSD or because BM2 had a history of anti-military bias.

*Deviation from BM2 Policy*

Relatedly, Ragland contends that because BM2's owners "felt physically threatened by this ex-Marine when they learned of his confrontation with his supervisor the day before his termination," they chose to notify him of his termination "via telephone, in a departure from the company's normal practice of in-person terminations, and then even refused to let him return to the office to pick up his personal effects." Appellant Br. at 14-15.  The record belies this argument. The undisputed evidence shows that BM2 had previously terminated employees by telephone when they were—like Ragland—working remotely when the termination decision was made.

Ragland also argues that his "abrupt termination" without any prior formal warnings "deviated from [BM2's] general practice of progressive discipline." Appellant Br. at 22, 30. Although deviation from standard policies may constitute circumstantial evidence of discrimination, it does not support Ragland's case here because the evidence shows that BM2, as a new, growing company, did not have a regimented or well-established progressive discipline policy that was followed with any consistency.  Therefore, a reasonable fact-finder could not conclude from this record that BM2 deviated from its standard disciplinary or termination practices.

*Inconsistency Between BM2's Proffered Reasons and Its Treatment of Ragland*

Ragland next contends that BM2's position that Ragland's termination resulted in part from his deteriorating relationship with management over the first five months of 2016 "is plainly

inconsistent with management's decision to *promote* Mr. Ragland to team lead in January 2016."
Appellant Br. at 29. Likewise, Ragland contends, BM2's claim that Klever's perception of
Ragland worsened from February to May 2016 "is impossible to square . . . with Klever's
overwhelmingly positive comments about Mr. Ragland in February and late April 2016" in a
recommendation letter and handwritten note. *Id.* at 30.

Initially, BM2's decision to promote Ragland to one of four team lead positions in
recognition of his high sales volume in January 2016 is not plainly inconsistent with its contention
that after January 2016, management's perception of Ragland deteriorated because of his
subsequent actions, which BM2 ownership viewed as instances where Ragland repeatedly
questioned authority, sought exemptions from generally applicable rules, and stopped being a team
player. Klever testified that he "plagiarized" the contents of Ragland's recommendation letter and
wrote a similar handwritten note to every employee in the office to boost morale.[5] R. 19-1, PID
90-91. Thus, the record does not support Ragland's argument that BM2's stated reasons for
terminating him were inconsistent with its treatment of him during this same time.

*Comparator Evidence*

Finally, Ragland contends that BM2's treatment of Meloche, a non-veteran, was
sufficiently disparate to satisfy his prima facie burden. Ragland argues that "while [he] was
allegedly terminated for 'publicly disrespecting' his supervisor during a private meeting on May
16, BM2 never even disciplined Meloche in response to his multiple shouting matches with the
company's owners including when he stormed out of one such contentious meeting by slamming
the door and walking out of the office entirely." Appellant Br. at 21 (internal alteration and

---

[5] Klever further testified that "this is just my perception and opinion . . . Jason was and is a very intelligent
person that was a very good team player and became a team leader but became soured for whatever reason over the
course of a period of time and that his outlook upon BM2 changed in that time frame." R. 19-1, PID 93.

citations omitted omitted). In support, Ragland testified about three separate incidents he witnessed involving Meloche that he contends were similar to his own heated exchange with his supervisor. He also attached declarations from two former BM2 employees who stated that they observed Meloche yell at BM2's owners. Despite these events, Ragland argues, BM2 did not discipline Meloche. Nor did they fire Meloche when Meloche later got into a disagreement with a co-worker and "caused an accounting assistant to be so upset that she went into her manager's office with tears in her eyes." R. 28-1, PID 604.[6] In response, BM2 points to testimony from BM2's owners and Meloche himself that these events never occurred, and argues that, even if they did, Meloche is not a similarly situated comparator because, unlike Ragland, BM2's owners never saw Meloche as detracting from the company's culture, which is the reason they fired Ragland.

Even assuming that Ragland and Meloche are similarly situated, the dispositive question is whether the alleged differential treatment of Meloche is sufficient to meet Ragland's burden under USERRA to demonstrate by a preponderance of the evidence that his veteran status was a substantial or motivating factor in his termination. It is not. One of our recent USERRA cases demonstrates why.

In *Savage v. Federal Express Corp.*, 856 F.3d 440 (6th Cir. 2017), we considered whether the district court properly granted summary judgment in FedEx's favor on Savage's USERRA discrimination and retaliation claims. In support of his prima facie case, Savage introduced the following:

---

[6] The record reflects that both of these events occurred in 2017 and 2018—several months after Ragland's termination—and after BM2 hired a new manager, Jeff Coe, who insisted that BM2 begin systematically documenting disciplinary conduct through written records in an individual's personnel file. *See, e.g.*, R. 28-1, PID 608-09. Meloche was formally disciplined for these two incidents.

13

- Evidence of a close temporal relationship—33 days between his protected activity (a complaint) and a resulting suspension and 41 days between his complaint and his termination. *Id.* at 449.

- Evidence of anti-military animus by the decisionmaker. Savage's manager issued a threat against another employee that he planned to remove him for "doing too much military service" and later wrote Savage up for "scheduling military service during a busy time of year." *Id.* (internal quotations and citations omitted).

- Evidence that FedEx had a policy of differentially treating servicemembers, including "refusing to allow service member mechanics performing military service to bid on future work shifts, which reduced their earnings in violation of USERRA" and "errors in making pension contributions for pilots who served in the military." *Id.* at 449-50.

- Evidence that Savage may have been targeted for discrimination because he acted as a leader who made complaints to FedEx on behalf of other service members. *Id.* at 450.

- Comparator evidence that he was treated more harshly than other employees who were accused of engaging in similar behavior but who were not terminated. *Id.* at 450-51. We noted that the "differences between Savage's treatment and that of [these other employees] could raise an inference that FedEx was motivated to discharge Savage based on his protected activity." *Id.* at 451. We ultimately concluded that this evidence provides "*some support* for his prima facie case." *Id.* (emphasis added).

Despite the amount and types of evidence, we remarked that "[t]he evidence presented is close on whether Savage has met his initial burden to show by a preponderance that his protected status was a motivating factor in the adverse action taken against him," but nevertheless concluded that he had "offered sufficient circumstantial evidence to draw an inference that satisfies his burden at the prima facie stage." *Id.*

We concluded in *Savage* that comparator evidence may support an employee's prima facie case by providing a basis on which to infer the employer's discriminatory motivation. *Id.* at 450-51; *accord, e.g.*, *Hance*, 571 F.3d at 518. Crucially, however, in *Savage*, there were several additional evidentiary bases supporting such an inference, including overt anti-military comments by Savage's supervisors and several instances of the employer's differential treatment of veterans. Thus, Savage provided sufficient evidentiary support from which a jury could reasonably conclude

that his military service was a substantial or motivating factor in his termination. Unlike Savage, Ragland can only rely on the alleged differential treatment of Meloche. However, there is no evidence to support the inference that any differential treatment was based on Ragland's veteran status, and Ragland has not carried his burden to show his military service was a substantial or motivating factor in the decision to terminate his employment.

For the foregoing reasons, we **AFFIRM** the judgment of the district court.